UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
ROCHESTER DIVISION

MARLENE A. KRULY,

    Plaintiff,

v.

AKOUSTIS TECHNOLOGIES, INC.,

    Defendant.

Case No. 6:21-cv-06181-FPG-MWP

**DEFENDANT AKOUSTIS TECHNOLOGIES, INC.'S STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56(a)(1)**

Pursuant to Local Civil Rule 56(a)(1), Defendant Akoustis Technologies, Inc. ("Defendant" or the "Company") submits the following Statement of Material Facts in support of Defendant's motion for summary judgment.

## I. Kruly's Employment with Akoustis as an Accounts Payable Specialist

1.    Akoustis, Inc.[1] is a radio frequency bulk acoustic wave (RF BAW) filter company that targets high-power, high-frequency, and ultra-wideband solutions for WiFi AP, 5G infrastructure, 5G mobile, and other markets. During the relevant period, Akoustis had approximately 75 employees across two locations: the corporate headquarters in Huntersville, North Carolina and the manufacturing facility in Canandaigua, New York (which had less than 50 employees). (Appendix at Ex. 1, Holly Johnson Dep. at T20:19-21; Appendix at Ex. 2, Declaration of Holly Johnson at ¶¶ 4-7; Appendix at Ex. 3, Second Amended Complaint at ¶ 10; Appendix at Ex. 4, TriNet FMLA Notice of Eligibility.)[2]

---

[1] Akoustis, Inc. is a wholly owned subsidiary of Defendant.
[2] The Appendix refers to the Appendix to Defendant Akoustis Technologies, Inc.'s Statement of Material Facts Pursuant to Local Rule 56(a)(1) submitted herewith.

2. Plaintiff Marlene Kruly commenced her at-will employment with Akoustis on October 2, 2017, as an Accounts Payable Specialist. This was a full-time position. (Appendix at Ex. 5, Kruly Dep. at T25:23-26:9, 36:1-3.)

3. Except for a short period at the beginning of her employment, Kruly was the only Accounts Payable Specialist at Akoustis and the only person who was responsible for the account payable functions for both of Akoustis' locations in New York and North Carolina. (Appendix at Ex. 5, Kruly Dep. at T26:11-27:8, 30:10-14; Appendix at Ex. 6, Boller Dep. at T15:8-22.)

4. Kruly reported directly to Dave Pettitt ("Pettitt"), Plant Financial Controller. (Appendix at Ex. 5, Kruly Dep. at T27:20-28:5; Appendix at Ex. 7, Pettitt Dep. at T7:17-18.)

5. At no time during her employment did Kruly raise any complaints of harassment or discrimination based on her disability or any other protected category, to anyone at Akoustis. (Appendix at Ex. 5, Kruly Dep. at T65:16-66:5.)

**II.    Kruly is Provided with an Extended Medical Leave of Absence**

6. In or around May 2019, Kruly was diagnosed with a vestibular disturbance. This medical issue prevented her from coming into work on certain days because she could not drive and was not feeling well. Around the same time, Kruly also was diagnosed with lung cancer. Akoustis permitted Kruly to take whatever time she needed off from work due to the vestibular disturbance and lung cancer, including unpaid days off after she exhausted her paid time off. (Appendix at Ex. 5, Kruly Dep. at T67:24-69:17, 70:12-15, 72:4-12.)

7. The last day that Kruly worked was May 31, 2019. (Appendix at Ex. 8, Extended Leave of Absence Request Approval Form.)

8. About two weeks later, on or about June 12, 2019, Kruly submitted an application for an indefinite leave of absence, effective June 3, 2019. (Appendix at Ex. 5, Kruly Dep. at T76:7-77:6).

9. Even though Kruly requested an indefinite leave of absence with no return-to-work date provided, on June 13, 2019, Akoustis granted Kruly an unpaid, extended leave of absence as an accommodation, retroactive to June 3, 2019.[3] (Appendix at Ex. 5, Kruly Dep. at T79:8-20; Appendix at Ex. 1, Johnson Dep. at T106:13-20; Appendix at Ex. 8, Extended Leave of Absence Request; Appendix at Ex. 4, TriNet FMLA Notice of Eligibility.)

10. In a letter dated June 13, 2019, Holly Johnson, Akoustis's Director of Human Resources, explained to Kruly that the leave of absence was *not* job protected and also instructed her to keep the Company up to date with her status:

> In regard to your return to work date, although your LOA request is approved, we may need to fill your position while you are out and so there is no guarantee that a position will be available upon your return. Please be sure to touch base with me every month to let me know how you're doing and as we get closer to the date when you're able to return to work we will have more information about your current position availability or other open positions.

(Appendix at Ex. 5, Kruly Dep. at T79:21:80:6; Appendix at Ex. 9, Shealy Dep. at T67:9-15; Appendix at Ex. 10, June 13, 2019 Letter.)

11. Kruly admits that the only accommodation that she requested from Akoustis was a leave of absence starting June 3, 2019 and that Akoustis provided her with the accommodation she requested. (Appendix at Ex. 5, Kruly Dep. at T109:22-110:9).

---

[3] Kruly was not eligible for a leave of absence under the Family and Medical Leave Act ("FMLA") because the Company did not meet the threshold number of employees required to be covered under the FMLA. (Appendix at Ex. 4, TriNet FMLA Notice of Eligibility.)

12. On June 19, 2019, Kruly was informed that since she was granted a leave of absence that was "not covered under federal, state, or local leave laws, your benefits coverage will continue as if you are an active worksite employee for 30 days following your last day worked. After those 30 days, coverage will continue until the end of the month in which the 30th day occurs." (Appendix at Ex. 4, TriNet FMLA Notice of Eligibility).[4] As a result, Kruly was no longer eligible to participate in certain benefit plans, including health insurance, starting August 1, 2019, and would need to apply for COBRA. (*Id.*; Appendix at Ex. 1, Johnson Dep. at T105:23-106:12.) Kruly recognized that the termination of her benefits and requirement to apply for COBRA was not specific to her and would impact any employee who is out on a similar leave of absence. (Appendix at Ex. 11, June 26, 2019 E-mail.)

13. The Company waived Kruly's obligation to repay the portion of insurance premiums that she was required to pay as part of her leave of absence. (Appendix at Ex. 12, November 26, 2019 E-mail.)

### III. Kruly Failed to Provide an Anticipated Return to Work Date

14. On the leave of absence paperwork, Kruly did not provide an end date for the leave or an anticipated return to work date. Kruly testified that she did not provide a return-to-work date because she was not provided with any indication from her doctor of how much time off she would need. (Appendix at Ex. 5, Kruly Dep. at T78:15-79:7.)

15. Kruly testified that when she spoke to Ken Boller, Akoustis's then-Interim Chief Financial Officer, in or around late June 2019 about her leave of absence, she did not discuss an anticipated return-to-work date because she did not have one yet. (Appendix at Ex. 5, Kruly Dep. at T86:25-87:22.)

---

[4] TriNet is a professional employer organization (PEO) that assisted the Company with various payroll and human resources related functions at the time. (Appendix at Ex. 1, Johnson Dep. at T125:7-126:16).

16. Kruly testified that when she provided Pettitt with periodic status updates in July and August 2019, she did not have an anticipated return to work date. (Appendix at Ex. 5, Kruly Dep. at T90:4-91:20, 92:7-93:1.)

17. On August 19, 2019, Kruly provided a status update to Lora Shealy, Akoustis's Human Resources Manager. Shealy asked Kruly if she had an anticipated return to work date and Kruly responded that she "wouldn't even dare to guess[.]" (Appendix at Ex. 5, Kruly Dep. at T93:20-95:8; Appendix at Ex. 13, August 19, 2019 E-mail.) Shealy testified that after receiving this e-mail, Kruly "implied to me that she had no idea when she would be returning to work so it was a question. It was a question mark, like when could she come back. We don't really know." (Appendix at Ex. 9, Shealy Dep. at T122:5-10.)

### IV. Akoustis Relocates the Accounts Payable Position to North Carolina for Business Reasons

18. Boller's role as Interim Chief Financial Officer was to bring structure to the Company and implement various controls, policies, and procedures. As part of that process, in or around the spring of 2019, before Kruly's lung cancer diagnosis and her informing the Company of her medical condition and request for leave, Boller began to consider transitioning the Accounts Payable function from New York to North Carolina. (Appendix at Ex. 6, Boller Dep. at T24:9-22.)

19. Boller sought to relocate the Accounts Payable position because, in his "experience, the accounts payable role has always been sort of a shared services role around the corporate area." Boller explained that the Accounts Payable function is "a service performed that benefits the full entire company, but out of one central location . . . typically within corporate headquarters." (Appendix at Ex. 6, Boller Dep. at T24:15-25:10.)

5

20. Boller testified that the reasons for relocating the position included:

> [T]o allow Dave [Pettitt, Kruly's direct supervisor] to perform his role as plant controller, try to get him away from the accounts payable part of his job moving it to Andrew who was a manager down here [in North Carolina]. Part of it was that was the model that I am used to. As I mentioned earlier, that role is more of a corporate function or shared services function. We were also cutting checks out of North Carolina[.]
>
> * * *
>
> It just allows us to have more control of the process and especially at that time, we were struggling to bring control a lot of different processes and procedures throughout the company.

(Appendix at Ex. 6, Boller Dep. at T28:6-29:1.)

21. On May 13, 2019, Johnson, Boller, and Pettitt had a meeting where Boller expressed that he was considering moving Accounts Payable to the Company's corporate headquarters in North Carolina. Boller asked Pettitt to provide input on the pros and cons of moving the position to North Carolina versus keeping it in New York. (Appendix at Ex. 14, M. Kruly Data Points; Appendix at Ex. 7, Pettitt Dep. at T31:3-13; Appendix at Ex. 6, Boller Dep. at T25:16-26:6; Appendix at Ex. 1, Johnson Dep. at T85:9-23.)

22. On May 22, 2019, Pettitt sent Boller an e-mail that evaluated the pros and cons of relocating the Accounts Payable position from New York to North Carolina. (Appendix at Ex. 7, Pettitt Dep. at T77:18-78:5; Appendix at Ex. 15, May 22, 2019 E-mail.)

23. At the time Boller sought input from Pettitt, Boller was unaware that Kruly was experiencing a health issue or had any possible disability. These discussions took place before Kruly began a leave of absence. (Appendix at Ex. 6, Boller Dep. at T32:16-33:20, 34:3-10.)

24. When Kruly began her leave of absence, Pettitt covered the Accounts Payable job duties and responsibilities. At some point, Pettitt contacted Boller and requested help because he

6

could not continue performing the accounts payable work in addition to his own duties and responsibilities. (Appendix at Ex. 7, Pettitt Dep. at T33:3-9; Appendix at Ex. 6, Boller Dep. at T36:17-22; Appendix at Ex. 1, Johnson Dep. at T91:14-92:5, 92:22-93:93:18.)

25. Following Pettitt's request for accounts payable support, on or about July 12, 2019, the Company began the process of obtaining internal approval to hire a temporary Accounts Payable Specialist, who would work in North Carolina. (Appendix at Ex. 16, Job Requisition Form dated July 12, 2019.)

26. Boller made the ultimate decision to relocate the Accounts Payable position from New York to North Carolina. Pettitt, Johnson, and Shealy were not involved. (Appendix at Ex. 6, Boller Dep. at T41:5-18; Appendix at Ex. 1, Johnson Dep. at T95:21-1, 96:16-19; Appendix at Ex. 9, Shealy Dep. at T58:23-59:20; Appendix at Ex. 7, Pettitt Dep. at T32:11-33:2, 93:11-14.)

27. Boller made the decision to relocate the Accounts Payable position to North Carolina before the temp was hired. At that time, Kruly remained on an indefinite leave of absence. (Appendix at Ex. 6, Boller Dep. at T40:17-20, 82:1-6.)[5]

28. Ultimately, Kristen Gaines ("Gaines") was hired as a temporary employee to fill the Accounts Payable role in North Carolina. Pettitt was not involved in the decision to hire a temp. (Appendix at Ex. 7, Pettitt Dep. at T32:19-33:2; Appendix at Ex. 6, Boller Dep. at T37:4-15; Appendix at Ex. 1, Johnson Dep. at T92:22-93:5; Appendix at Ex. 9, Shealy Dep. at T64:8-10.)

29. Shortly after Kruly's August 19, 2019 e-mail that she would not even "dare to guess" when she could return to work, the Company decided to hire Gaines as a permanent employee in or around early September 2019. Gaines was selected for the permanent position

---

[5] Kruly testified that she probably would not have relocated to North Carolina if it was offered to her. (Appendix at Ex. 5, Kruly Dep. at T107:1-4.)

because she was doing a very good job in the temporary role and the Company did not want to lose her. (Appendix at Ex. 17, Johnson's Notes dated September 5, 2019 and November 8, 2019; Appendix at Ex. 18, E-mail dated September 10, 2019; Appendix at Ex. 13, August 19, 2019 E-mail; Appendix at Ex. 1, Johnson Dep. at T93:6-18, 85:6-13.)

30. A few days after Boller made the decision to relocate the position permanently, on or about September 12, 2019, Shealy and Andrew DiFilippantonio began the process of completing the Company's internal job requisition forms to formalize hiring Gaines as a permanent employee. The job requisition process, which was the final step in converting Gaines from a temporary to permanent employee, was completed on September 13, 2019 at approximately 10:10 a.m. (Appendix at Ex. 19, Job Requisition E-mails dated September 12-13, 2019; Appendix at Ex. 20, Job Requisition Form dated September 13, 2019.)

31. Once Gaines was hired as a permanent employee, there was no Accounts Payable position for Kruly to return to in New York. (Appendix at Ex. 6, Boller Dep. at T82:14-17.)

32. At the time the Company decided to hire Gaines as a permanent employee to fill the Accounts Payable position in North Carolina, Kruly did not have a reliable return to work date and was not cleared to return to work. (Appendix at Ex. 1, Johnson Dep. at T104:7-15.)

**V.  Kruly provides an estimated return-to-work date after Akoustis filled the position.**

33. On September 13, 2019 at 2:42 p.m., *after* Gaines was hired as a permanent employee to fill the sole Accounts Payable position, Kruly e-mailed Shealy with documentation from her medical provider with an anticipated return to work date of December 1, 2019—six months after her leave of absence began. Kruly admits that this was the first time she ever provided a return-to-work date to Akoustis. (Appendix at Ex. 5, Kruly Dep. at T95:9-96:24, 98:24-99:2; Appendix at Ex. 21, September 13, 2019 E-mail.)

8

34. Akoustis did not inform Plaintiff at that time that her position had been permanently filled and that there was no position for her to return to as it wanted her to focus on her recovery. (Appendix at Ex. 22, Declaration of Holly Johnson in Support of Motion for Summary Judgment).

35. In November, Kruly contacted Shealy to let her know that she was ready to come back to work. (Appendix at Ex. 5, Kruly Dep. at T99:10-100:7).

36. According to Kruly, to return to work, she would also require restrictions including a 30-32-hour workweek and the ability to work from home. Kruly advised Shealy of these additional restrictions during their November 19, 2019 phone call; however, Plaintiff did not provide any medical documentation to the Company advising of the need for additional restrictions. (Appendix at Ex. 5, Kruly Dep. at T97:8-98:16, 110:10-13.)[6]

37. During a phone call on November 21, 2019, Shealy informed Kruly that there was no position available for Kruly to return to. (Appendix at Ex. 5, Kruly Dep. at T101:23-102:8; Appendix at Ex. 9, Shealy Dep. at T159:20-160:13.)

38. The Accounts Payable position was a full-time position that could not be performed on a reduced basis. Additionally, the job duties and responsibilities – including printing invoices, getting signatures and approvals, and compiling the required packages – required the role to be performed at work, rather than remotely. As Boller explained, the Company was not set up for remote work at that time: "We were very much still paper, pen, filing cabinet type of function." (Appendix at Ex. 6, Boller Dep. at T88:22-4, 92:10-22; Appendix at Ex. 7, Pettitt Dep. at T87:16-90:5).

---

[6] To this day, Kruly does not know if she would even be capable of working a 40-hour workweek today. (Appendix at Ex. 5, Kruly Dep. at T121:12-18.)

39. Plaintiff admits that the job duties and responsibilities she performed as an Accounts Payable specialist required her to be present in the office to perform them. (Appendix at Ex. 5, Kruly Dep. at T32:22-33:1).

Respectfully submitted,

/s/ *David I. Klass*
David I. Klass
**FISHER & PHILLIPS LLP**
227 West Trade Street, Suite 2020
Charlotte, North Carolina 28202
Telephone: (704) 334-4565
Facsimile: (704) 334-9774
Email: dklass@fisherphillips.com

Sarah Wieselthier, Esq.
**FISHER & PHILLIPS LLP**
430 Mountain Avenue, Suite 303
Murray Hill, New Jersey 07974
Telephone: (908) 516-1050
Facsimile: (908) 516-1051
Email: swieselthier@fisherphillips.com

*Attorneys for Defendant*

Dated: September 30, 2022

10

FP 44887106.6