UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
ROCHESTER DIVISION

MARLENE A. KRULY,

     Plaintiff,

     v.

AKOUSTIS TECHNOLOGIES, INC.,

     Defendant.

Case No. 6:21-cv-06181-FPG-MWP

**APPENDIX TO DEFENDANT
AKOUSTIS TECHNOLOGIES,
INC.'S STATEMENT OF
MATERIAL FACTS PURSUANT
TO LOCAL RULE 56(a)(1)**

Pursuant to Local Rule 56(a)(1), Defendant Akoustis Technologies, Inc. hereby submits the following Appendix to its Statement of Material Facts:

1.     Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the transcript of the June 9, 2022 deposition of Holly Johnson.

2.     Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Holly Johnson.

3.     Attached hereto as Exhibit 3 is a true and correct copy of the Second Amended Complaint filed on February 17, 2022.

4.     Attached hereto as Exhibit 4 is a true and correct copy of the TriNet FMLA Notice of Eligibility dated June 19, 2019, bearing production numbers Akoustis-Kruly 476-481.

5.     Attached hereto as Exhibit 5 is a true and correct copy of excerpts of the transcript of the February 11, 2022 deposition of Plaintiff Marlene Kruly.

6.     Attached hereto as Exhibit 6 is a true and correct copy of excerpts of the transcript of the July 1, 2022 deposition of Kenneth Boller.

7. Attached hereto as Exhibit 7 is a true and correct copy of excerpts of the transcript of the June 24, 2022 deposition of David Pettitt.

8. Attached hereto as Exhibit 8 is a true and correct copy of the Extended Leave of Absence Request Approval Form dated June 13, 2019, bearing production number Akoustis-Kruly 426.

9. Attached hereto as Exhibit 9 is a true and correct copy of excerpts of the transcript of the June 23, 2022 deposition of Lora Shealy.

10. Attached hereto as Exhibit 10 is a true and correct copy of a letter dated June 13, 2019, bearing production number Akoustis-Kruly 425.

11. Attached hereto as Exhibit 11 is a true and correct copy of an e-mail dated June 26, 2019, bearing production number Akoustis-Kruly 588.

12. Attached hereto as Exhibit 12 is a true and correct copy of an e-mail dated November 26, 2019, bearing production number Akoustis-Kruly 506.

13. Attached hereto as Exhibit 13 is a true and correct copy of an e-mail dated August 19, 2019, bearing production numbers Akoustis-Kruly 489-490.

14. Attached hereto as Exhibit 14 is a true and correct copy of Holly Johnson's notes titled "M. Kruly Data Points," bearing production numbers Akoustis-Kruly 435-437.

15. Attached hereto as Exhibit 15 is a true and correct copy of an e-mail dated May 22, 2019, bearing production number Akoustis-Kruly 382.

16. Attached hereto as Exhibit 16 is a true and correct copy of a Job Requisition Form dated July 12, 2019, bearing production numbers Akoustis-Kruly 309-310.

17.     Attached hereto as Exhibit 17 is a true and correct copy of Holly Johnson's notes dated September 5, 2019 and November 8, 2019, bearing production numbers Akoustis-Kruly 714-716.

18.     Attached hereto as Exhibit 18 is a true and correct copy of an e-mail dated September 10, 2019, bearing production number Akoustis-Kruly 706.

19.     Attached hereto as Exhibit 19 is a true and correct copy of e-mails dated September 12-13, 2019, bearing production numbers Akoustis-Kruly 707-713.

20.     Attached hereto as Exhibit 20 is a true and correct copy of a Job Requisition Form dated September 13, 2019, bearing production numbers Akoustis-Kruly 311-312.

21.     Attached hereto as Exhibit 21 is a true and correct copy of an e-mail dated September 13, 2019, with attachments, bearing production numbers Akoustis-Kruly 497-499.

22.     Attached hereto as Exhibit 22 is a true and correct copy of the Declaration of Holly Johnson in Support of the Motion for Summary Judgment.

Respectfully submitted,

/s/ *David I. Klass*
David I. Klass
**FISHER & PHILLIPS LLP**
227 West Trade Street, Suite 2020
Charlotte, North Carolina 28202
Telephone: (704) 334-4565
Facsimile: (704) 334-9774
Email: dklass@fisherphillips.com

Sarah Wieselthier, Esq.
**FISHER & PHILLIPS LLP**
430 Mountain Avenue, Suite 303
Murray Hill, New Jersey 07974
Telephone: (908) 516-1050
Facsimile: (908) 516-1051
Email: swieselthier@fisherphillips.com

Dated:  September 30, 2022                    *Attorneys for Defendant*

3

# EXHIBIT 1

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NEW YORK

3   ------------------------------------------------

4   **MARLENE A. KRULY,**

5                   Plaintiff,

6    -vs-                        Index No. 21-CV-6181G

7   **AKOUSTIS TECHNOLOGIES, INC.,**

8                   Defendant.
    ------------------------------------------------

9

10          **EXAMINATION BEFORE TRIAL OF HOLLY JOHNSON**

11                  **APPEARING REMOTELY FROM**

12              **HUNTERSVILLE, NORTH CAROLINA**

13

14

15                  June 9, 2022

16              2:29 p.m. - 6:03 p.m.

17               pursuant to notice

18

19

20   REPORTED BY:

21   Carrie A. Fisher, Notary Public

22   APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

23

1       Akoustis.  You know, where do you have

2       employees working, and approximately how many

3       employees at each of those locations?

4  A. Well currently --

5       MS. WIESELTHIER:  Objection to form.  I

6       just want to clarify when you say number of

7       employees, what time period are you referring

8       to?

9       MR. SANDERS:  Sure.  Let's talk about

10      2019 unless I say otherwise.

11      MS. WIESELTHIER:  Thank you.

12  Q. And approximately.  We're not looking for

13      exact head counts.

14  A. I don't remember how many employees we had.

15      Well, okay -- well, I started in -- I started

16      in 2019 so it was very different back then.  I

17      guess approximate?

18  Q. Yeah.

19  A. We had employees in North Carolina and New

20      York, and I think it was about 75 employees in

21      total.

22  Q. What was the breakdown between New York and

23      North Carolina?

1    Q.  Would that have been something that she would

2        have been offered the opportunity to move to

3        North Carolina if the position moved to North

4        Carolina?

5    A.  Quite possibly, yes.

6    Q.  Was that something that finance had discussed?

7    A.  I don't -- I don't know if they had gotten

8        that far in the discussion.

9    Q.  When did finance begin discussing moving the

10       position to North Carolina?

11   A.  I think it was sometime in May.

12   Q.  How did it first come to your attention that

13       finance was considering moving the position to

14       North Carolina?

15   A.  It was sometime just in discussions with Ken,

16       Ken Boller, and the finance team, how we were

17       going to get the work done -- or how they were

18       getting the work done that made more sense for

19       that part of the team and the function to be

20       centralized here.  They had just been

21       discussing that happening.  Just because I am

22       a part of the team and because of my job, I

23       get pulled into those types of discussions.

1   A. I don't -- I don't know that her name came up

2       but later on in the year we ended up hiring a

3       temporary here in North Carolina to do the

4       work.

5   Q. And that's Christine?

6   A. Kristen, yes.

7   Q. Kristen, Kristen, sorry.

8           Okay.  So in the context of hiring

9       Kristen as a temp, was there a discussion

10      about whether or not that was part of a

11      permanent plan to move the function to North

12      Carolina or was that just intended as a

13      stopgap while Marlene was out?

14  A. Initially I believe that -- initially it was a

15      temporary position to get some help.

16          At first, you know, the position was

17      still in New York.  Dave was -- Dave was like:

18      "I am just going to try to do the work myself.

19      I don't know how long Marlene is going to be

20      out.  I don't want to hire a temp and then

21      turnaround and -- you know, train them, do all

22      that and then Marlene comes back and, you

23      know, it's just not worth the time.  I'm just

1    going to do it."

2        We didn't know how long Marlene would be

3    out.  Hopefully she will be back.  Let's wait.

4    That was the -- that was our thought at the

5    time.

6    Q. And at that point in time Dave is working in

7    New York and Kristen is working in North

8    Carolina, correct?

9    A. No, there was no Kristen yet.

10    Q. Once Kristen started.

11    A. Yeah, no, at that point it was just Dave doing

12    two jobs.

13    Q. And once Kristen started as a temp, was she

14    reporting to Dave?

15    A. No.  Well --

16    Q. Who did she report to?

17    A. Actually, I take that back.  I don't know who

18    she was reporting to.  She may have been

19    reporting to dual people when she started.

20    Q. Who else would it be other than Dave?

21    A. Andrew who she eventually ended up reporting

22    to.  So eventually the decision was we need

23    help, we need somebody to do accounts payable,

1    we can't -- you know, Dave can't continue to

2    do it himself.  He needs -- there is one

3    person who does the job in the whole company

4    so let's get a temporary in so we got -- we

5    brought Kristen in as a temp.

6         It was conveyed to me that, you know,

7    she was doing a great job over that -- my

8    understanding is that over the course of that

9    time they began to move the accounts payable

10   function from -- the duties from New York to

11   North Carolina and then decided that at some

12   point along the way that Kristen was -- the

13   job had been moved, all the work had been

14   moved here, and that Kristen was also -- at

15   some point along the way Kristen was doing a

16   really good job and they didn't want to lose

17   her since she was a temp, so then they

18   finished transferring the job, the work here.

19        I don't know if -- now I forgot what you

20   asked me.

21   Q. That's okay.  I will move onto another

22   question.

23        Initially when Kristen was hired as a

1        about, hey, let's not have her be a temp

2        anymore?

3   A.  I don't know if I got that timeline right.  I

4        don't know.  I'd have to look back at the

5        timeline to see.  It seems like she was here a

6        couple of -- I'm not sure how long she was

7        here before we decided or they -- before

8        finance decided that they did not want to lose

9        her.  She was doing such a good job.

10       Temporary, we could lose her.  At the same

11       time that she was here, they decided to move

12       the work here and it has been here for the

13       last year.

14   Q. At one point you said that Dave decided to

15       move the accounts payable to North Carolina,

16       but earlier on it was a conversation between

17       Ken and finance.  So I want to ask this first:

18       Is Dave a part of the finance -- Ken's finance

19       team, or was he in 2019?

20   A. First of all, if I said that, I didn't mean to

21       say that.  Dave did not make the decision to

22       move that here, to move AP here.  That was not

23       Dave's decision, and he did not make that

1       decision.  That was Ken Boller, Ken Boller or

2       at least the finance team.  He would have made

3       that decision along with members of his team

4       but that was his decision so --

5   Q. Would Andrew have had a role in that decision?

6   A. Andrew was the accounting manager.  Andrew

7       reported to Brad Wilson who is the director of

8       finance who reports to Ken, so Brad would

9       have -- would have been a part of that

10      decision along with Ken.  Andrew would not

11      have been a -- really would not have been a

12      decision maker.  It would have been Ken and

13      Brad.

14          Dave is a part of the finance team.

15      Dave reports to Ken directly along with Brad.

16   Q. Did you have any input into that decision?

17   A. To move the position here?

18   Q. Yes.

19   A. No, that wouldn't have been my decision.

20   Q. Okay.  So we were talking about discussions

21      about the move of the position that also

22      involved how it might impact Marlene.  So we

23      talked about the first conversation where the

1          MR. SANDERS:  We will just skip 9.

2      Thank you for catching that.

3

4      BY MR. SANDERS:

5   Q. As of September 5th, at the time of your

6      handwritten note, and September 13th or 12th,

7      the email about making her permanent, as of

8      that first part of September, what was

9      Marlene's status as you understood it?

10  A. My knowledge is that she was still out, you

11     know, on a medical leave of absence.

12  Q. Did you have any understanding at that point

13     in time as to when, if at all, she may be

14     cleared to return to work?

15  A. No.

16  Q. All right.  So let's mark this as 15.  It will

17     be Bates numbers 497, 498, 499.

18         All right.  So do you see here that

19     Ms. Kruly sent to Lora on September 13th, she

20     says she sent some letters from her doctors?

21     Do you see that?

22  A. Yes.

23  Q. Okay.  And then if we look at 498, there is a

1      letter from a doctor dated September 5

2      referencing a return to work of 12/1 and then

3      another one September 10 also saying that she

4      would not be able to return to work until

5      12/1.  Do you see those there?

6  A. Yes.

7  Q. Did Lora share with you in September that

8      Marlene had provided updated medical through

9      the end of November?

10  A. Was the -- the date that Marlene sent that,

11      that was on September the 13th, that email?

12  Q. Yeah, yeah.  Is that something Lora would have

13      shared with you?

14  A. I am sure that she did.  I don't necessarily

15      remember when she shared it with me.  Lora

16      worked part time then, but certainly she would

17      have shared that with me.

18  Q. Okay.  So sometime in September, whether it

19      was the 13th or around then, Lora would have

20      told you that Marlene's current return to work

21      was not going to be before December 1?

22  A. Yes.

23  Q. Now, you were aware that Ms. Kruly's health

1        insurance was terminated sometime July 31st or

2        August 1st, correct?

3   A. Yes.

4   Q. Okay.  And why is that?

5   A. That's just what happens.  That's a part of

6        the process when employees don't work when

7        they're not covered under an FMLA or, you

8        know, a workers' comp situation or something

9        like that, the insurance companies don't keep

10       them covered on insurance.  It's not anything

11       that Akoustis can do anything about.  That's a

12       part of the insurance plan's decision.

13  Q. And why is it that Ms. Kruly was not covered

14       under FMLA?

15  A. Because the company didn't have enough

16       employees.  New York didn't have -- there

17       weren't enough employees in New York.  You had

18       to have, you know, 50 employees there.  There

19       weren't enough employees, so we didn't have

20       that.

21  Q. And even though Ms. Kruly did not have FMLA

22       rights in terms of the continued health

23       insurance and, you know, the right to come

1     BY MR. SANDERS:

2  Q. Ms. Johnson, who is Mark Burgess?

3  A. He was the human capital advisor, HR advisor

4     at TriNet.

5  Q. And what was his role vis-à-vis your company

6     at that point in time in 2019?

7  A. Well, our company worked with TriNet.  TriNet

8     was our PEO, the professional employment

9     organization, that we worked with.  So we --

10    like a co-employment relationship so --

11 Q. What do you mean by "a co-employment

12    relationship"?  I am sorry to interrupt you

13    there.

14 A. Yeah, that's okay.  So it's like with a PEO

15    they -- they handle all of the payroll and

16    benefits and reporting and taxes and all these

17    things for us for our employees and our

18    paychecks even have TriNet on them.  They

19    don't even say Akoustis.  Even though you

20    would say "I work for Akoustis," you wouldn't

21    say, "I work for TriNet."

22         I have a hard time -- that's the best I

23    can -- that's how I explain PEOs as a

1　　　　professional employer organization.  And they

2　　　　usually -- usually smaller companies like to

3　　　　work with PEOs because PEO companies will work

4　　　　with a lot of small companies so that those

5　　　　small companies can work -- can get a

6　　　　better -- work together and get like a better

7　　　　benefit option, whereas a small company can't

8　　　　get good benefit coverage.  Am I making sense?

9　　　　I hope I am making sense here.  In order to

10　　　　get good benefits when you're a small company,

11　　　　you know, you get terrible rates and all that

12　　　　so a lot of times they like to work with a

13　　　　PEO.

14　　　　　　　So then whenever you're tied up with a

15　　　　PEO like we were with TriNet, you do tend to

16　　　　consult with them on employment matters.  You

17　　　　have EPL insurance coverage with them and so

18　　　　you have these different people/consultants

19　　　　with them like Mark Burgess was.  So we would

20　　　　contact him about different things that we

21　　　　would -- before we would do them.

22　　Q. Got it.

23　　A. To get his opinion.

STATE OF NEW YORK)

COUNTY OF ERIE   )


     I, Carrie A. Fisher, Notary Public, in and
for the County of Erie, State of New York, do
hereby certify:


     That the witness whose testimony appears
hereinbefore was, before the commencement of
their testimony, duly sworn to testify the
truth, the whole truth and nothing but the
truth; that said testimony was taken remotely
pursuant to notice at the time and place as
herein set forth; that said testimony was
taken down by me and thereafter transcribed
into typewriting, and I hereby certify the
foregoing testimony is a full, true and
correct transcription of my shorthand notes so
taken.


     I further certify that I am neither counsel
for nor related to any party to said action,
nor in anyway interested in the outcome
thereof.


     IN WITNESS WHEREOF, I have hereunto
subscribed my name and affixed my seal this
30th day of June, 2022.


     _____
     Carrie A. Fisher
     Notary Public - State of New York
     No. 01FI6240227
     Qualified in Erie County
     My commission expires 5/02/23

# EXHIBIT 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
ROCHESTER DIVISION

MARLENE A. KRULY,

Plaintiff,

v.

Case No. 6:21-cv-06181-FPG

AKOUSTIS TECHNOLOGIES, INC.,

Defendant.

## **DECLARATION OF HOLLY JOHNSON**

1. My name is Holly Johnson. I am over the age of 18 and I am competent to make the statements in this Declaration. I declare under penalty of perjury that the statements in this Declaration are true and correct to the best of my knowledge.

2. I make all statements in this Declaration based on my personal knowledge.

3. I am a resident of the state of North Carolina. I hold a North Carolina driver's license and I am registered to vote in North Carolina.

4. Defendant Akoustis Technologies, Inc. is a corporation organized under the laws of Delaware. Akoustis' headquarters is located in Huntersville, North Carolina.

5. Akoustis Technologies, Inc. is the holding company of Akoustis, Inc. Akoustis, Inc. is a Delaware is a corporation organized under the laws of Delaware. Akoustis, Inc.'s headquarters is located in Huntersville, North Carolina. Plaintiff, as well as all other employees of the company, are or were employed by Akoustis, Inc., not Akoustis Technologies, Inc. All references below to "Akoustis" refer to Akoustis, Inc.

6. I work for Akoustis at its headquarters in Huntersville as Director of Human Resources. I have worked there in that capacity since January 2019.

7. Akoustis employed Marlene Kruly as an Accounts Payable Specialist from October 2017 to November 2019. Kruly worked at Akoustis's facility in Canandaigua, New York, and was the company's sole Accounts Payable Specialist.

8. The decision to hire Kruly in 2017 was made in part by Thomas Sloan, formerly the Assistant Corporate Controller for Akoustis. At the time, Sloan resided in the Western District of North Carolina and worked at Akoustis's headquarters in Huntersville. He made the decision to hire her there.

9. A true and accurate copy of Akoustis's letter offering Kruly employment is attached as **Exhibit A.** It was created in Huntersville and lists Akoustis's Huntersville address on each page.

10. In March of 2019, after Kruly exhibited significant performance and attendance issues, I placed Kruly on a "development plan" with the goal of communicating Akoustis' expectations to Kruly and resulting in improved performance by her. But Kruly continued to have performance issues for the next several months until her leave of absence began in June 2019.

11. The decision to grant Kruly's June 2019 request to be placed on a leave of absence was made in combination by Dave Pettit, Lora Shealy, Ken Boller and I, all of whom worked in the Huntersville location, other than Dave Pettit.

12. The decision to separate Kruly from employment later in 2019 was made by Kenneth Boller, Akoustis's Interim CFO and Corporate Controller, as well as Lora Shealy and I. Boller resides in the Western District of North Carolina and works at Akoustis's headquarters in Huntersville. Shealy, the former Manager of Human Resources, lived and worked for Akoustis in the Western District of North Carolina at the time and through the end of her employment with

Akoustis. The decision to separate Kruly from employment was made in the Western District of North Carolina.

13.     Several other employees that reside in the Western District of North Carolina and work for Akoustis in Huntersville have information relevant to this case and are expected to be witnesses in this case. These individuals include Kristen Gaines (Kruly's replacement), Shealy, and me.

14.     Jennifer Barcarse is employed by Akoustis at its Canandaigua facility as an Operations Program Manager. She did not participate in the decision to terminate Kruly's employment.

15.     David Pettitt is employed by Akoustis at its Canandaigua facility as Plant Financial Controller. While Pettit was Kruly's direct supervisor when she worked for Akoustis, he did not participate in the decision to separate Kruly from employment.

16.     Documents relevant to this case, including Kruly's personnel file and other information regarding her employment at Akoustis, are located at Akoustis's headquarters in Huntersville.

17.     I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746(2).

Holly Johnson
Holly Johnson

3

# EXHIBIT A



September 27, 2017


Marlene Kruly
225 Mason Street
Canandaigua, NY 14424


Dear Marlene:

We are pleased to present the following offer of employment. This letter will summarize and confirm the details of our offer for you to join Akoustis, in the full-time position of Accounts Payable Specialist commencing on October 2, 2017 and reporting to Thomas Sloan, Assistant Corporate Controller.

In order to effectively perform in this role, the job position is based at Akoustis' Foundry located in Canandaigua, NY. You are expected to work during the core hours of 8:00 a.m. to 5:00 p.m. Monday through Friday unless otherwise communicated by your manager and approved by Human Resources.

<u>Orientation Information</u>: Your new employee orientation meeting will be scheduled at (time TBD) with Jennifer Barcarse on your first day of employment.

Here are the specific details of our offer:

<u>TriNet HR Corporation</u>: This letter and accompanying enclosure will summarize important details of matters pertaining to your employment. Please review the benefit handouts (emailed to you previously) regarding current benefits, which are provided to the workforce here at Akoustis. Our benefits, payroll, and other human resource management services are provided through TriNet HR Corporation, a professional employer organization. As a result of Akoustis' arrangement with TriNet, TriNet will be considered your employer of record for these purposes and your managers here at Akoustis will be responsible for directing your work, reviewing your performance, setting your schedule, and otherwise directing your work at Akoustis.

<u>Compensation</u>: Your base compensation will be $45,000 annually paid bi-weekly, less payroll deductions and required taxes and withholdings. This is a non-exempt position and your schedule will be 40 hours per week plus pre-approved overtime as required. Your work hours will be determined by your manager. Overtime pay will be consistent with applicable law and regulations.

You will also have an annual target bonus of 10 percent of your annual salary (prorated based on your start date for the first target bonus period) if all milestones are met for Akoustis as determined by and at the discretion of our Board of Directors and subject to the provisions set forth in the Akoustis, Inc. 2016 Stock Incentive Plan.



**Options to be Granted During the Next Open Trading Window**: You will also be granted option for $2,000 shares of common stock under the 2016 Plan, at an exercise price per share equal to the fair market value per share of common stock on the grant date; vesting 25% on each of the first, second, third, and fourth anniversaries of the date of grant subject to the employee's full time employment from the grant date until each vesting date and to the terms and conditions of the 2016 Plan and applicable award agreements in form established by the Compensation Committee.

Further, you will accrue on a bi-weekly basis a total of 2 weeks of paid PTO per year (during your first year) and a total of 3 weeks of paid PTO per year (during your second year and afterwards). You will also be included in the Akoustis 401K plan, that currently includes four percent company matching.

**Benefits**: Akoustis through TriNet, offers a full range of benefits for you and your qualified dependents as outlined in the Summary of Benefits provided to you during your interview. A presentation of our benefits program will be given to you during your first week of employment. Additional information will also be available on-line on the terms and conditions included in the Terms and Conditions Agreement (TCA) each new employee must accept in order to access TriNet's on-line self-service portal, TriNet Passport.

This offer of employment is contingent upon you fulfilling each of the following terms:

**Pre Employment Screening**: According to company policy, you are required to successfully complete reference, social security, drug screening, driving records and criminal background checks (the last to the extent allowed by applicable law).

**Acknowledgement of Company Handbook and Confidentiality Agreement**: As an Akoustis employee, you are required to follow its rules and regulations. Therefore, you will be asked to acknowledge in writing that you have read the Akoustis employee handbook and sign and comply with the attached Proprietary Information and Inventions Agreement (the "Employee Confidentiality, Proprietary Information and Patent and Invention Assignment Agreement"), which prohibits, among other things, the unauthorized use or disclosure of Akoustis' confidential and proprietary information. In order to retain necessary flexibility in the administration of its policies and procedures, Akoustis reserves the right to change or revise its policies, procedures, and benefits at any time.

**Required Documentation**: To comply with the government-mandated confirmation of employment eligibility, please review the enclosed I-9 Form and "Lists of Acceptable Documents" as approved by the United States Department of Justice for establishing identity and employment eligibility. Please bring the required I-9 documents with you on your first day of employment; failure to submit proof of your employment eligibility will postpone your start date or result in termination of your employment.

**At Will Employment**: Please understand, as stated in all job offers, Akoustis is an employment-at-will company. That means that you or the Company may terminate your employment at any time, with or without cause and with or without prior notice.


**AKOUSTIS**
TECHNOLOGIES

This offer letter, together with the TCA and your Proprietary Information Agreement, forms the complete and exclusive agreement as to your employment with Akoustis. It supersedes any other agreements or promises made to you by anyone, whether oral or written, regarding your employment with Akoustis. Changes to the terms of this letter require a written modification signed by an authorized employee of Akoustis.

If you wish to accept employment at Akoustis under the terms described above, please sign and date this letter and return to Jennifer Barcarse at Akoustis (jbarcarse@akoustis.com). Please retain copies for your records. This offer expires at 12 midnight on Friday, September 29, 2017.

Marlene, we are excited that you are joining Akoustis' team and feel that you have a great deal to contribute. If you have any questions, please feel free to call Jen Barcarse at (585) 919-3040.

Sincerely,

*Thomas Sloan*

**Thomas Sloan**
**Assistant Corporate Controller**

I understand and accept the terms of this employment offer.

*Marlene A. Kruly*
Marlene Kruly

*September 27, 2017*
Date

*October 2, 2017*
Start Date

cc: HR

Attachments:
- Employee Confidentiality, Proprietary Information and Patent and Invention Assignment Agreement
- I-9 Form and "Lists of Acceptable Documents"

9805-H Northcross Center Ct Huntersville NC 28078

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARLENE A. KRULY | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 6:21-CV-06181 – (FPG) |
| v. | ) | |
| | ) | SECOND AMENDED COMPLAINT |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC. | ) | JURY TRIAL DEMAND |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**Paragraph #38 is removed from the First Amended Complaint and is the only amended portion of the instant Second Amended Complaint.**

## NATURE OF THE ACTION

On behalf of Plaintiff Marlene A. Kruly, (referred to hereinafter as "Plaintiff" or "Marlene Kruly") for her complaint against Akoustis Technologies, Inc. (referred to hereinafter as "Defendant" or "Employer" or "Akoustis") states and alleges as follows:

### Jurisdiction and Venue

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Section 107(a) of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5(f)(1) and (3) and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      This Court has original jurisdiction over this action, and each count, pursuant to 29 U.S.C. § 2617 and 28 U.S.C. § 1331.

3.      Venue of this action in the United States District Court for the Western District of New York is proper pursuant to 28 U.S.C. § 1391(b) because the Plaintiff was employed and subjected to unlawful discrimination by defendant in Canandaigua, New York in Ontario County, within the Western District of New York, and a substantial part of the events giving rise to these claims, occurred in said locale.

4.      All conditions precedent to the filing of this lawsuit have been met. Plaintiff timely filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR") (Charge number 10205318) which was dual-filed with the United States Equal Employment Opportunity Commission ("EEOC") under Federal Charge Number 16GC000961, which resulted in a "Probable Cause Determination" pursuant to which the NYSDHR concluded "PROBABLE CAUSE exists to believe that Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of." (Determination is attached hereto as Exhibit "**A**").

5.      Subsequently, Plaintiff was issued a Right To Sue letter by the EEOC, which was received by Plaintiff fewer than 90 days from the date hereof (Attached hereto as Exhibit "**B**") and Plaintiff files the instant Complaint within 90 days from her receipt of the "Right To Sue Letter" dated November 24, 2020.

6.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Western District of New York, Rochester Division, where Plaintiff was employed by Akoustis at all relevant times hereto.

7.     The employment practices complained of herein were intentional and malicious in nature.

## PARTIES

8.     Plaintiff, Marlene Kruly, a female and resident of Canandaigua, New York in Ontario County, was at all relevant times hereto, an employee of Defendant Akoustis, where she began employment as an "Accounts Payable Specialist" on or about October 2, 2017 until Defendant terminated Plaintiff from her employment on November 21, 2019.

9.     Defendant, Akoustis Technologies, Inc., employed Plaintiff at times relevant to this Complaint in Ontario County, New York. Akoustis is a Delaware-formed and North Carolina-based corporation operating in New York State as a "Foreign Business Corporation", where it operates out of its Canandaigua, NY facility.

10.     Akoustis describes its business on its website as follows: "…a high-tech BAW RF filter solutions company that is pioneering next-generation materials science to address the market requirements for improved RF filters - targeting higher bandwidth, higher operating frequencies and higher output power compared to incumbent polycrystalline BAW technology deployed today."

11.     Akoustis, upon information has continuously been an employer engaged in an industry affecting commerce under Section 101(5) of the ADA, 42 U.S.C.§ 12111(5), and Section 101(7) of the ADA, 42 U.S.C. § 12111(7), which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S.C. §§ 2000e(g) and (h).

## STATEMENT OF CLAIMS

12.     All conditions precedent to the institution of this lawsuit have been fulfilled.

13.     On December 9, 2019, Plaintiff filed a Verified Complaint with the New York

State Division of Human Rights ("NYSDHR") alleging that Defendant unlawfully discriminated against her in the course of her employment on the basis of her disability.

14.     More specifically, Plaintiff alleges that Defendant discriminatorily and intentionally failed to duly accommodate her reasonable requests for accommodation or to even engage in the required interactive process and furthermore, it targeted her for termination and in fact terminated her employment, while she was out of work on short-term disability leave for cancer treatment, shortly after Plaintiff had notified Akoustis of her return –to-work date.

15.     Plaintiff went out on short-term disability leave on June 3, 2019 for cancer treatment.

16.     Shortly after duly taking her medical leave, Defendant Akoustis sent Plaintiff a letter notifying her of the possibility that it would not keep her job open to her when she was ready to return to work.

17.     On or about August 19, 2019, Plaintiff informed Defendant that her chemotherapy treatment was going to last longer than her Oncologist had previously expected.

18.     On or about September 13, 2019, Plaintiff notified Defendant Akoustis that she would be able to return to her job as of December 1, 2019.

19.     On November 19, 2019, Plaintiff Marlene Kruly provided Defendant with medical documentation highlighting her restrictions upon return to work.

20.     Two days after Plaintiff Marlene Kruly submitted to her employer her anticipated restrictions for her return to work, Defendant Akoustis fired her.

21.     Pouring salt in the wound of the foregoing, upon information and belief, Defendant removed Plaintiff's health insurance coverage and life insurance coverage during her leave for cancer treatment.

22.     Plaintiff, who was the Accounts Payable Specialist for Defendant, informed Defendant Akoustis of her cancer diagnosis in May of 2019.

23.     Less than one month after informing Defendant of her diagnosis, in June of 2019, Plaintiff requested an unpaid leave of absence for her cancer, a qualified disability under the Americans with Disabilities Act and the New York State Human Rights Law.

24.     Plaintiff had lung cancer, which affected several major life activities including temporarily impeding her ability to work during radiation and chemotherapy treatments, adversely affecting her sleep, creating anxiety and depression, creating severe fatigue and other adverse effects.

25.     At the time that Plaintiff took her medical leave of absence, she did not know her expected return date because the date of her return depended upon how well she responded to her radiation and chemotherapy treatments.

26.     Defendant approved of Plaintiff's "Extended Leave of Absence" in a letter dated June 13, 2019.

27.     Prior to taking a Leave of Absence, Plaintiff had excelled at her job and her performance at her job was more than satisfactory.

28.     In the letter dated June 13, 2019 approving of Plaintiff's leave, Defendant's Director of Human Resources actually stated in writing that Akoustis "may need to fill your position while you are out and so there is no guarantee that a position will be available upon your return."

29.     Defendant failed to engage in the Required Interactive Process with Plaintiff prior to notifying Plaintiff that by virtue of her medical leave, she may well lose her job.

30.     Defendant indeed hired a temporary Accounts Payable Specialist to work from its

North Carolina headquarters in order to cover Plaintiff's absence.

31.     Pursuant to letter dated September 5 and September 10, 2019 sent to defendant, Plaintiff's doctors medically cleared Plaintiff to return to work as of December 1, 2019.

32.     On November 5, 2019, Plaintiff's physician determined that she would require the following restrictions upon her return to work: "work hours may be limited to 30-32 hours: may be able to work from home: requires periodic rest during the day: and follow-up medical treatments will be required for the next five year."

33.     Meanwhile, Defendant had canceled Plaintiff's health insurance while she remained employed by Defendant; in July of 2019.

34.     Defendant also canceled Plaintiff's life insurance policy at or around the same time as the cancellation of Plaintiff's health insurance.

35.     Defendant failed utterly to accommodate Plaintiff, her restrictions, or her accommodation of temporary time off even though to have done so would not have been unduly burdensome to Akoustis.

36.     Plaintiff could have performed the essential functions of her position with accommodation had Defendant offered to accommodate her, which it failed to do.

37.     There is a temporal proximity between Plaintiff's disability and leave, and her termination from employment insofar as Plaintiff was fired during her authorized medical leave, less than 10 days prior to Plaintiff's anticipated return to work, about which Defendant had been apprised.

38.     Notably, in its investigatory Findings, the DHR concluded that "Probable Cause exists to believe that the Respondent (Akoustis) has engaged in or is engaging in the unlawful discriminatory practice complained of." (Exhibit "**A**").

39.     But for Plaintiff's lung cancer diagnosis, Defendant would not have terminated Plaintiff Marlene Kruly's employment.

40.     Defendant failed utterly to engage in the required interactive process in terms of exploring ways in which Plaintiff could have been accommodated.

41.     Plaintiff duly performed the essential functions of her position at all times relevant hereto despite her battle with cancer, and she could have performed the essential functions of her position had Defendant engaged in the interactive process with her, but Defendant chose instead to summarily terminate a valuable employee, simply because she was ill with a serious ADA-qualified disability.

42.     At the time of her termination from employment, Plaintiff was suffering from symptoms of her disability and treatment, all of which Akoustis was actually aware of, but affirmatively chose to ignore.

43.     Had Defendant even tried to work with Plaintiff, Plaintiff hereby asserts that she could have continued gainful employment at Akoustis, and that such accommodation would not have posed an undue burden upon Defendant.

44.     Plaintiff suffered severe emotional distress as a direct and proximate cause of her termination from employment, for which he is entitled to relief in an amount to be proven at or before trial, which amount exceeds the jurisdictional minimum amount required to be in controversy in the present court.

45.     Plaintiff suffered actual monetary damages in the form of lost wages following her termination from employment for which she is entitled to relief.

46.     Notwithstanding that Plaintiff has satisfied her duty to mitigate her damages by exercising a good faith effort to mitigate, those damages continue to accrue and are expected to

be well into the six figures.

47.     Plaintiff's costs, including include attorneys' fees continue to accrue.

48.      The present Complaint shall have been filed in the Federal District Court, Western District of New York, fewer than 90 days after receiving the Right To Sue letter from the Equal Employment Opportunity Commission.

49.     Plaintiff hereby incorporates by reference each and every allegation and averment made above as though fully set forth herein.

50.     As a direct and proximate result of Defendant's discrimination against Plaintiff, Plaintiff has suffered damages in an amount to be determined at trial, including, but not limited to, the loss of her career at Akoustis, lost wages, lost promotion opportunities, related fringe benefits, and other forms of compensation, as well as loss of career opportunity and advancement, in amounts yet to be determined at or before trial

51.     Defendant Akoustis acted in a decidedly callous manner when it cast aside one of its own; a hard-working woman who happened to be afflicted with a serious form of cancer with when it failed to accommodate her reasonable requests for accommodation, failed to engage her in the interactive process, shunned her, excluded her, ignored her medically-backed pleas for assistance, and ultimately FIRED her, causing her to lose her income that she depended on, while at her absolute weakest point and at precisely the worst possible time.

**COUNT I:**

**Disability Discrimination - Title I of the Americans with Disabilities Act of 1990 ("ADA").**

By failing to engage in the Required Interactive Process with Plaintiff in regards to her anticipated return to work following Lung Cancer treatment, by cancelling Plaintiff's benefits, including but not limited to health insurance and life insurance while Plaintiff was on an authorized medical leave from her employment at Akoustis, so that she could obtain treatment for her Lung Cancer, and by terminating Plaintiff's employment during her authorized medical leave to treat her ADA Qualified condition of Cancer, only approximately 10 days prior to her anticipated return to work following cancer treatment, Defendant discriminated against Plaintiff in violation the ADA.

**COUNT II:**

**Disability Discrimination - N.Y. Exec. Law, art. 15 (New York State Human Rights Law).**

By failing to engage in the Required Interactive Process with Plaintiff in regards to her anticipated return to work following Lung Cancer treatment, by cancelling Plaintiff's benefits, including but not limited to health insurance and life insurance while Plaintiff was on an authorized medical leave from her employment at Akoustis, so that she could obtain treatment for her Lung Cancer, and by terminating Plaintiff's employment during her authorized medical leave to treat her ADA Qualified condition of Cancer, only approximately 10 days prior to her anticipated return to work following cancer treatment, Defendant discriminated against Plaintiff in violation New York State Human Rights law prohibiting discrimination in employment on the basis of disability.

**PRAYER FOR RELIEF**

**Wherefore**, the Plaintiff respectfully requests that this Court:

A.      Grant a permanent injunction enjoining Defendant Employer, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from mistreating, or terminating qualified individuals from employment, or discriminating against employees due to disability.

B.      Order Defendant Employer to institute and carry out policies, practices, and programs which provide equal employment opportunities to all employees, and which protect employees from unlawful discrimination on the basis of disabilities.

C.      Order Defendant Employer to make whole Marlene Kruly by providing appropriate back pay, with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

D.      Order Defendant Employer to make whole Marlene Kruly by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described herein-above, in amounts to be determined at trial.

E.      Order Defendant Employer to make whole Marlene Kruly by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices, including the discrimination complained of herein-above, which caused emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

F.      Order Defendant Employer to pay punitive damages as a result of the malice and intentional nature of the discrimination alleged herein, so as to punish Defendant for its knowing discrimination and violation of the law, to the detriment of Plaintiff and Plaintiff's career.

G.      Grant such further relief as the Court deems necessary and proper in the public interest.

## JURY TRIAL DEMAND

The Plaintiff requests a jury trial on all questions of fact raised by its complaint.

Respectfully Submitted,

S:// James D. Hartt
**JAMES D. HARTT, ESQ.,**
**Attorney For Plaintiff-Admitted to**
**Practice in WDNY Federal Court**
**6 North Main Street, Suite 200F**
**Fairport, NY 14450**
**Telephone: (585) 490-7100**
**Fax: 1 (716) 299-2006**

ORIGINAL of the foregoing was
filed this 9th Day of February 2022 with:
The Clerk of the Federal District Court
Western District New York District, Rochester Division

# EXHIBIT 4



9805 Double R Boulevard, Ste. 200
Reno, Nevada 89521-2946
Phone 800.638.0461
Fax 510.352.6480
www.trinet.com

June 19, 2019

Marlene Kruly
225 Mason St
Canadaigua, NY 14424

**RE: Family Medical Leave Act (FMLA) Notice of Eligibility and Rights & Responsibilities**

Dear Marlene Kruly,

On June 13, 2019 you informed us that you needed leave beginning on June 3, 2019 due to a serious health condition.

**Part A – Notice of Eligibility**

This Notice is to inform you that you:

☐ Are eligible for FMLA leave. (See Part B below for Rights and Responsibilities)

☒ Are not eligible for FMLA leave, because (only one reason need be checked, although you may not be eligible for other reasons):

    ☐ You have not met the FMLA's 12-month length of service requirement. As of the first date of requested leave, you will have worked approximately      months towards this requirement.

    ☐ You have not met the FMLA's 1,250-hours-worked requirement.

    ☒ You do not work and/or report to a site with 50 or more employees within 75-miles.

    ☐ You have exhausted your FMLA leave entitlement in the applicable 12-month period.

**Part B – Rights and Responsibilities**

**In order for us to determine whether your absence qualifies as FMLA leave**, you must return the following information to us within 15 days of receipt of this notice. If sufficient information is not provided in a timely manner, your leave may be denied or delayed, and you may be subject to disciplinary action, up to and including termination of employment, for excessive absences. Leave of Absence Medical Certification information you provide to TriNet may be provided to your Akoustis Inc. (hereinafter referred to as your "Worksite Employer") upon request of an authorized worksite representative.

    ☐ Sufficient certification to support your request for FMLA leave. A certification form that sets forth the information necessary to support your request ☐ is/ ☐ is not enclosed.

    ☐ Sufficient documentation to establish the required relationship between you and your family member.

**If you are qualified for FMLA leave**, you will have the following **rights** while on leave:

- You will generally have a right for up to 12 weeks of unpaid leave in a 12-month period calculated as a "rolling" 12-month period measured backward from the date of any FMLA leave usage.

- You will have a right for up to 26 weeks of unpaid leave in a single 12-month period to care for a covered service member with a serious injury or illness. This single 12-month period commenced on Date (If applicable).

- Your health benefits will be available for up to 12 weeks of any such qualifying leave under the same conditions as if you continued to work. For any period of leave beyond 12 weeks, your health benefits will be available only through COBRA. See above about your responsibilities regarding continuation of your health benefits.

*Akoustis-Kruly 000476*



- You must be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions of employment on your return from FMLA-protected leave. (If your leave extends beyond the end of your FMLA entitlement, you do not have return rights under FMLA.)

- If you are using any paid leave, it will run concurrently with your FMLA leave. If you do not meet the requirements for taking paid leave, you remain entitled to take unpaid FMLA leave.

You will have the following **responsibilities** while on leave:

☐ If you are approved for FMLA and if you have not returned to work after leave, then your active benefits will terminate and you will become eligible for COBRA and you will be advised of your COBRA rights via a separate mailing.

☒ Contact your worksite employer to make arrangements to continue to make your share, if any, of the premium payments on your health insurance to maintain health benefits while you are on leave. If you normally pay a portion of the premiums for your health insurance, these payments will still need to be made during the period of leave. Your Worksite Employer will pay its normal share and will be invoiced for your share of the benefit premiums. Your Worksite Employer may require that you pay for your share of any benefit premiums either through a payment agreement or other arrangement. If payment is not timely made, your group health insurance may be cancelled, provided we notify you in writing at least 15 days before the date that your health coverage will lapse, or, at its option, your Worksite Employer may pay your share of the premiums during leave, and recover these payments from you upon your return to work. If you do not return to work following leave for a reason other than (i) the continuation, recurrence, or onset of a serious health condition which would entitle you to leave, (ii) the continuation, recurrence, or onset of a covered service member's serious injury or illness which would entitle you to leave, or (iii) other circumstances beyond your control, you may be required to reimburse your Worksite Employer for health insurance premiums paid on your behalf during your leave.

☒ If a portion of your paycheck normally goes to pay for certain voluntary benefits such as additional GVUL life or AFLAC, you may need to make payment directly to the providers of these benefits during your leave, assuming you wish to continue these benefits during your leave. If you need contact information, refer to login.trinet.com or call the TriNet Solution Center at 800.638.0461.

☒ During your leave you will be required to furnish us with periodic reports of your status and intent to return to work every 30 days. If the circumstances of your leave change and you are able to return to work earlier than the date indicated, you will be required to notify your Worksite Employer at least two work days prior to the date you intend to report for work. You may also be required to furnish recertification relating to a serious health condition.

☒ You may be required to present a fitness-for-duty certificate prior to being restored to employment. If such certification is required but not received, your return to work will be delayed or may be denied if the certification is not provided within the required time period.

You will be given notice if the requested time off will be designated as FMLA leave once you have provided the requested information. In the meantime, it will be provisionally designated as such. We want to ensure that you understand your rights and responsibilities under FMLA. If you have general questions, please contact the TriNet Solution Center at 800.638.0461, 5:00 a.m. to 6:00 p.m. PT, Monday through Friday. A representative will be happy to assist you.

Sincerely,


TriNet Leave of Absence Center of Excellence

| FOR TRINET USE ONLY | Processor: TG |
|---|---|



6/19/2019

Marlene Kruly
225 Mason St
Canadaigua, NY 14424

RE: Your Leave of Absence

Dear Marlene Kruly,

We have been notified of your request for a leave of absence (LOA or leave) beginning on **6/3/2019**. If you are granted an extended LOA which is not covered under a federal, state, or local leave law, your TriNet benefits eligibility will continue as if you are an active worksite employee for 30 days following your last day worked or last day of PTO, vacation, or sick hours used in lieu of hours worked. After those 30 days, your benefits coverage will continue until the end of the month in which the 30th day occurs.

Based on our initial review of the LOA submission details provided to us by your worksite human resources representative, we estimate that your LOA **may not** be covered under a federal, state, or local leave law. Additional information may be enclosed or provided separately to notify you of your rights and responsibilities associated with the applicable leave law.

If you and your covered dependents are no longer eligible for health care coverage through the TriNet Plan, under certain circumstances you/they may be eligible to continue coverage under the Federal Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985. Please refer to the TriNet Benefits Guidebook and Summary Plan Description for more information related to COBRA continuation coverage.

**Keep your Worksite Employer Informed**
While on your LOA, provide your worksite employer with periodic reports of your status and intent to return to work. If you are able to return to work earlier than anticipated, or if your LOA needs to be extended, you are required to provide advance notice to your worksite employer. In addition, if your LOA is due to your own serious illness, you must provide updated medical information to extend your LOA or provide a medical release upon your return to work. If you return to work with limitations or need follow-up care, be sure to discuss this with your worksite employer.

**Wage Replacement Options**
**TriNet Disability Benefits (Short-Term or Long-Term Disability)**
TriNet disability insurance provides you with partial income when you are unable to work due to an eligible illness or injury.

To confirm that you are enrolled in TriNet disability coverage, log in to TriNet at login.trinet.com, then click **Benefits** > **Overview** and look for **Short-Term Disability** and **Long-Term Disability**. To apply for disability benefits, contact Aetna directly at 866.825.0184. Weekly and monthly maximums, elimination periods, waiting periods, and other rules exist and should be discussed with Aetna directly, or refer to the Carrier Certificates located on login.trinet.com > **Benefits** > **Carriers**.

There are two TriNet disability plans:

**Short-Term Disability (STD)** is for a temporary disability due to an eligible non-occupational illness or injury or an eligible disabling pregnancy-related condition.

**Long-Term Disability (LTD)** can provide coverage when a six-month period has elapsed since the onset of the eligible disabling condition. The covered conditions may be occupational or non-occupational and can be the result of illness, injury, or related to a disabling pregnancy.

Eligibility for disability benefits will be determined solely by Aetna in accordance with its underwriting guidelines. If you are deemed by Aetna to be disabled, benefits will be calculated according to the language found within the applicable Carrier Certificate. TriNet cannot and does not influence or affect Aetna's determination in any way.

Please refer to the Disability Insurance section of the TriNet Benefits Guidebook and the Carrier Certificates for additional information.

### State Disability Insurance (SDI)
SDI is partial wage-replacement insurance for workers in California, Hawaii, New Jersey, Puerto Rico, and Rhode Island. If you work in one of those locations, other than Hawaii, you should submit a claim directly with the applicable state. If you work in Hawaii, you must apply by contacting Aetna at 866.825.0184. Please let them know that you are initiating a Hawaii state disability claim.

**New York State Disability Benefits (DBL) and Paid Family Leave (PFL)**
If you *work* in the State of New York and wish to apply for DBL, your New York DBL claim form should be in this LOA Packet. If you wish to file for PFL, you must initiate the claim by completing the employee portion of the PFL claim form. The PFL claim form can be found on the carrier's website at: www.sslicny.com.

If you are approved for SDI/DBL benefits in addition to TriNet STD or LTD benefits, it is your responsibility to immediately notify Aetna at 866.825.0184. Your TriNet disability benefits will be reduced by your SDI/DBL payments. **Failure to notify Aetna in a timely manner of your receipt of SDI/DBL benefits may result in overpayments, which may either reduce your future disability payments or require you to repay the carrier.**

**Please note,** all SDI/DBL claims are approved, paid, and processed directly by the applicable state disability office or carrier, not by TriNet. Please contact the applicable state disability office or carrier for further assistance.

### Your TriNet Benefits While You Are on Leave
The following is a summary of what you can expect with regard to your TriNet benefits while you are on an LOA. Please refer to the TriNet Employee Handbook, TriNet Benefits Guidebook, and Summary Plan Description for more information related to your benefits while on an LOA.

If you are granted an extended LOA that is not covered under federal, state, or local leave laws, your benefits coverage will continue as if you are an active worksite employee for 30 days following your last day worked. After those 30 days, coverage will continue until the end of the month in which the 30th day occurs.

**If your benefits terminate while you are on leave:**

### Flexible Spending Account (FSA) While on Unpaid LOA
**Health Care FSA While on Paid LOA**
If you go on a paid LOA that provides for continuation of your TriNet health benefits, your health care FSA participation will continue and eligible expenses you incur after the start of your paid leave are eligible for reimbursement. Benefits plan year payroll deductions will continue during paid leave.

**Health Care FSA While on Unpaid LOA**

If you go on an unpaid LOA that provides for continuation of your TriNet health benefits, you have the following choices regarding your health care FSA.

1. Your health care FSA participation will continue and your payroll contributions will be on hold status unless you notify TriNet that you elect one of the options listed below. Eligible expenses you incur after the start of your unpaid LOA are eligible for reimbursement. Upon your return to work, your FSA payroll contributions will resume if you return to work in the same benefits plan year. Your remaining benefits plan year payroll contributions will be adjusted to make up for the contributions you missed during your unpaid leave.

2. You may submit a Life Status Change (LSC) form to elect to stop your health care FSA participation and contributions. Expenses you incur after the start of your unpaid LOA will not be eligible for reimbursement. Upon your return to work, your FSA payroll contributions will resume if you return in the same benefits plan year. Your annual health care FSA election will be reduced by the total amount of payroll contributions you missed during your unpaid leave.

3. You may notify TriNet that you would like to contribute through a lump sum pre-tax salary reduction payment before your unpaid LOA commences and continue to incur eligible expenses during your leave. This option is only available with an advance 30-day notice prior to the commencement of your LOA date. Upon your return to work, your FSA payroll contributions will resume if you return in the same benefits plan year. Your remaining benefits plan year payroll contributions will be adjusted to account for your lump sum contribution.

4. You may notify TriNet that you would like to continue after-tax contributions by sending personal checks or money orders to TriNet during your LOA. You may continue to incur eligible expenses during your unpaid LOA. Your remaining benefits plan year payroll contributions will be adjusted to account for your post-tax contributions. Please keep in mind if you elect this option you will lose the pre-tax advantages for contributions submitted during your unpaid leave.

If you go on an unpaid LOA that does not provide for continuation of your TriNet health benefits, you will be offered COBRA continuation coverage. While on LOA, you can continue after-tax contributions through COBRA. If your unpaid LOA lasts more than 30 days, you may submit a new health care FSA election when you return to work.

**Dependent Day Care FSA While on LOA**

If you elected dependent day care FSA, day care expenses you incur after the first two (2) weeks of your period of paid or unpaid LOA are not eligible for reimbursement. If you are on paid LOA, benefits plan year payroll deductions will continue during the paid LOA unless you submit an LSC form to stop your dependent day care FSA participation. If you are on unpaid LOA, upon your return from leave you will be automatically re-enrolled in dependent day care FSA and your remaining payroll contributions will be recalculated and increased to make up for the contributions you missed during your unpaid LOA so that your total FSA election will equal what you originally elected for the year.

**Health Savings Account (HSA)**

It is your responsibility to manage and monitor your HSA. Please contact your HSA bank for specific questions related to contributions during your LOA. You may enroll in an HSA or change or stop your HSA deductions at any time during the year. The Employee Payroll Deduction Authorization Form is available on login.trinet.com by selecting **Company** > **Forms and Policies** > **Payroll Forms**. Your HSA election is for the benefits plan year. If you start or change your HSA payroll contributions after the plan year begins, consider that you are making a partial year election.

**Medical, Dental, and Vision Plans**

You will receive a COBRA notice and you must timely elect and pay for COBRA coverage if you want to continue benefits during your LOA.

*Akoustis-Kruly 000480*

### Basic, Supplemental, Spouse/Partner, and Child Life Insurance

The insurance carrier only allows 31 days after the termination of benefits for you to continue your basic life insurance or supplemental life insurance coverage for yourself, your spouse/domestic partner, or your child(ren). If your LOA results in the termination of life insurance benefits, pursuant to MetLife rules, MetLife must receive a completed conversion or portability application form from you within 31 days after the date your life insurance ends. You are solely responsible for meeting this deadline if you wish to continue your policy. Contact MetLife directly at 877.275.6387 for basic and supplemental life insurance conversion information or 888.252.3607 for supplemental life insurance portability information.

### Life Status Change (LSC) Events

If you have an LSC event while you are on an approved LOA, report it to TriNet within 30 days (60 days for a birth, adoption, or State Children's Health Insurance Program event). If you are on COBRA, slightly different rules may apply.

### Return to Work
### Return to Work Within 30 Days of Your Benefits Termination

If you return to work within 30 days of your benefits termination, and unless you elected TriNet COBRA, your prior elections under the Plan will be reinstated retroactive to the date your benefits terminated, and you will be responsible for any premiums due. Repayment will be collected via payroll deductions unless you made other arrangements with your worksite employer.

### Return to Work More Than 30 Days after Your Benefits Termination

If you return to work more than 30 days after termination of your benefits, you will be automatically enrolled into the health plans you had prior to the termination of your benefits and given the opportunity to make changes or re-elect health, life, and FSA benefits within 30 days of your return to full-time regular work.

For additional assistance, please contact the TriNet Solution Center at 800.638.0461, Monday–Friday 4:30 a.m.–9 p.m. PT.

Sincerely,


TriNet Leave of Absence Center of Excellence

*Akoustis-Kruly 000481*

# EXHIBIT 5

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NEW YORK
2
  -----------------------------
3  MARLENE A. KRULY,              )  CIVIL ACTION NO.
                                    6:21-CV-06181-(FPG)
4                                 )
           Plaintiff,
5                                 ) VIDEOCONFERENCE
                                     DEPOSITION
6     - vs -                      )      OF:
7                                 ) MARLENE A. KRULY
  AKOUSTIS TECHNOLOGIES, INC.,
8                                 )
9           Defendant.        )
  -----------------------------
10
11          TRANSCRIPT of the stenographic notes of
12  the proceedings in the above-captioned matter, as
13  taken by and before BARBARA A. BRADEY, a Certified
14  Court Reporter and Notary Public of the State of
15  New Jersey, held remotely via ZOOM
16  VIDEOCONFERENCING, with the Witness appearing from
17  her residence in Canandaigua, New York, on Friday,
18  February 11, 2022, commencing at 10:01 a.m.
19
20
21
22
23
24
25

1        A        Yes.

2        Q        And who did you interview with?

3        A        Jennifer Barcarse was one of them;

4   Kelly McMahon; Thomas Sloan.  And I believe that

5   was it.

6        Q        And who is Jennifer Barcarse?

7        A        At the time, she was the office

8   manager.

9        Q        And who is Kelly McMahon?

10       A        She was purchasing agent.

11       Q        And who is -- I believe it was

12  Thomas Sloan?

13       A        Yes, he was a former assistant

14  controller for the North Carolina office.

15       Q        And the position you were applying

16  for, was it in North Carolina?

17       A        No, it was in Canandaigua, New

18  York.

19       Q        And after you interviewed for the

20  position with these three individuals, were you

21  offered a position with the company?

22       A        Probably a few days later, I was.

23       Q        And what position were you

24  offered?

25       A        Accounts payable specialist.

1          Q        And was this a full-time role?

2          A        It was.

3          Q        And were you an at-will employee?

4          A        Yes.

5          Q        What is your understanding of what

6     it means to be an at-will employee?

7          A        That either the employee or the

8     employer can terminate the position with no

9     specific reasons given.

10         Q        And when you were hired by

11    Akoustis as the accounts payable specialist, were

12    you the only accounts payable specialist, or were

13    there a number of individuals in that role?

14         A        I believe there was another

15    individual in the North Carolina office that

16    worked on a part-time basis.

17         Q        And at some point -- did that

18    remain the case throughout your employment with

19    Akoustis?

20         A        It did for a short period of time

21    and then the role fully transferred to

22    Canandaigua.

23         Q        Do you recall around what time

24    that was?

25         A        What time what was?

1          Q       That the role fully transferred to
2     the Canandaigua office.
3          A       It was in 2018.  I can't remember
4     the month exactly.
5          Q       So at some point in 2018, you were
6     the only person doing accounts payable work for
7     the company?
8          A       Yes.
9          Q       Who did you report to when you
10    were first hired by the company?
11         A       Thomas Sloan.  And there was
12    another -- there was another woman.  I can't
13    remember her last name, but it was Cindy.  She was
14    the CFO at the time.
15         Q       Did there come a time where that
16    changed, who you reported to?
17         A       Eventually, yes.
18         Q       And when did that change?
19         A       I believe it was January of 2018.
20         Q       And starting in or around January
21    of 2018, who did you report to?
22         A       Dave Pettitt.
23         Q       Had you worked with Dave Pettitt
24    prior to that time?
25         A       I had not.

1          Q       Was Dave Pettitt new to the
2     company?
3          A       Yes, he was.
4          Q       And what was his position?
5          A       Controller.
6          Q       Was he also located in the
7     Canandaigua office?
8          A       He was.
9          Q       Can you describe for me the duties
10    and responsibilities that you had as an accounts
11    payable specialist?
12         A       I would receive invoices for the
13    Canandaigua office.  Then I would receive some
14    invoices from the North Carolina office prior to
15    it actually switching over to full-time.  They
16    were to be scanned, they were to be entered into
17    the computer software system.  Just basically
18    keeping things pretty much paid up and dealing
19    with vendors pretty much on a daily basis, dealing
20    with purchasing, dealing with the shipping
21    department.
22         Q       When you say, "dealing with
23    purchasing," what do you mean by that?
24         A       Well, sometimes there would be
25    conflicts for purchasing if there was a -- if

1    Canandaigua office.

2          Q      And you said you were also dealing

3    with vendors.  In what way?  Can you describe for

4    me what you would do to deal with vendors?

5          A      Sure.  They wanted to know when

6    their payment was expected; or they hadn't

7    received a check; if invoices were incorrect.  It

8    pretty much was a constant communication with a

9    variety of vendors that we dealt with.

10         Q      And these job duties and

11   responsibilities that you just described, were you

12   the only person at Akoustis who was responsible

13   for performing those duties?

14         A      Yes.

15         Q      I'm going to show you another

16   document.  We will mark it Exhibit 5.  Give me one

17   second.

18               MS. WIESELTHIER:  And for the

19   record, this is a document bearing production

20   numbers Akoustis-Kruly 305 to 306.

21               (Exhibit 5, Job description, was

22   presented to the witness via screen share.)

23         Q      Do you recognize this document?

24         A      I do.

25         Q      What is this document?

1    not -- mine originally did not mention excellent

2    time management, exceptional organization skills

3    and prioritize large volumes of work.  It was not

4    mentioned about the ability to effectively

5    communicate with managers, finance/accounting

6    staff, and vendors on a daily basis.  I don't

7    recall that verbiage, to be honest with you.

8            Q      And when you say that you don't

9    recall that verbiage under the qualifications,

10   would you agree that those were parts of your job

11   duties or essential to your duties as an accounts

12   payable specialist?  For example, having

13   organizational skills, effectively communicating.

14           A      Of course.

15           Q      Great.

16                  And you had pointed out the high

17   volume of invoices.  When you were the accounts

18   payable specialist, would you consider yourself to

19   have handled a high volume of invoices as part of

20   your job duties and responsibilities?

21           A      Yes.

22           Q      And these job duties and

23   responsibilities that you had as an accounts

24   payable specialist, they required you to be in the

25   office to perform, correct?

 1          A     Yes.

 2                MR. HARTT:  Sorry.  Sarah, can we

 3    go back to that exhibit and can you just scroll

 4    down for purposes of seeing the complete document?

 5                MS. WIESELTHIER:  Oh, sure.  You

 6    want to see the second page?

 7                MR. HARTT:  Yes.

 8                MS. WIESELTHIER:  Sure.

 9                MR. HARTT:  And is that where it

10    ends?

11                MS. WIESELTHIER:  Yep.

12                MR. HARTT:  Okay.

13                THE WITNESS:  And if you don't

14    mind me saying, the compensation was never on my

15    initial --

16                MS. WIESELTHIER:  That's fine.  I

17    was just asking about your duties and

18    responsibilities, not necessarily if this was the

19    precise document that you had when you started.

20    Thank you for that clarification.

21                MR. HARTT:  Thank you.

22          Q     Were you aware that while you were

23    an employee -- let me strike that.

24                While you were an employee of

25    Akoustis, were you aware that they had any

1          Q       When exactly did you start working

2     for Akoustis as an accounts receivable specialist?

3          A       October 2, 2017.

4          Q       At sometime shortly after you

5     started, did you require a leave of absence for a

6     medical issue?

7          A       Shortly after I started?  No, not

8     shortly after I started.  The only time I required

9     a leave of absence was in 2019.

10         Q       You don't recall having to take

11    some time off in or around November or December of

12    2017 or January of 2018?

13         A       I don't recall that.

14         Q       No?  Okay.

15                 I'm going to show you a document

16    we'll mark as Exhibit 7.  It has production number

17    Akoustis-Kruly 54.

18                 (Exhibit 7, Letter to Ms. Kruly

19    from Ms. Shealy, dated 11/29/17, was presented to

20    the witness via screen share.)

21         Q       Do you recognize this document?

22         A       Yes.

23         Q       Okay.  And in the first paragraph

24    of the document, it says, "Please have your

25    medical provider review the attached medical

1   training was, how often it was, how many hours it
2   was?
3          A      Pretty much four days a week, an
4   hour or two a day.
5          Q      And you said you completed that
6   training?
7          A      I didn't complete it because I was
8   ill at the time.
9          Q      So at some point while you were
10  going through the training sessions, you were ill?
11         A      I was.
12         Q      So you didn't get to complete it
13  because you were subsequently out of work; is that
14  correct?
15         A      That is correct.
16         Q      So other than the complaints that
17  we've discussed thus far, do you recall having
18  made any other complaints about Dave Pettitt
19  during your course of employment with Akoustis?
20         A      Not that I'm aware of.
21         Q      Did you ever make any complaints
22  to the hotline?
23         A      No.
24         Q      Did you ever make any complaints
25  to TriNet?

1          A      No.

2          Q      Do you know what TriNet is?

3          A      I do.

4          Q      And what is TriNet?

5          A      TriNet was Akoustis' HR platform.

6          Q      At what point did you become ill

7     and start missing work?  Or sorry.  Become ill and

8     start needing to take time off from work.

9          A      Actually, I started feeling ill in

10    January of 2019.

11         Q      Did it affect your ability to work

12    at that time in January 2019?

13         A      I didn't feel well a lot of the

14    time.

15         Q      Did it affect your ability to

16    perform your job duties and responsibilities as an

17    accounts payable specialist?

18         A      I was there.  I mean, I did the

19    best that I could.

20         Q      Did you inform anyone in January

21    2019 that you were feeling ill?

22         A      Yes.

23         Q      Who?

24         A      I believe I told Dave, I told Jen,

25    I told Kelly.

1          Q      And who was Kelly?

2          A      Kelly McMahon, purchasing agent.

3          Q      What specifically did you tell

4     Dave?

5          A      I told him that I didn't feel

6     well, I didn't know what was going on, but I

7     wasn't feeling up to par.

8          Q      Did you share anything else at

9     that time in January 2019?

10         A      Not that I recall.

11         Q      What did you tell Jen at that

12    time?

13         A      Pretty much the same thing.

14         Q      And what about Kelly, the same

15    thing?

16         A      Yes.

17         Q      And what was their response?

18         A      I don't recall.

19         Q      At what point did you start

20    missing work?

21         A      I don't recall specifically, but

22    if I had started feeling ill in January I would

23    assume that there were times in January.

24         Q      Did you have paid time off

25    available for those absences?

1          A       Some I did, yes.  And then I used

2    up some of them -- I used up most of them.  So the

3    rest of the time I took with no pay.

4          Q       And Akoustis permitted you to take

5    the unpaid days off, correct?

6          A       Yes.

7          Q       When was the last day that you

8    physically worked at Akoustis?

9          A       I believe it was towards the end

10   of May of 2019.

11         Q       And what exactly were the health

12   issues that you were experiencing starting in

13   January of 2019?

14         A       Severe pain in my upper chest.

15   Just overall not feeling well.

16         Q       Was there a time when you were

17   diagnosed with vertigo?

18         A       Yes.

19         Q       And when was that?

20         A       I believe that was in May of 2019.

21   Actually, it was considered a vestibular

22   disturbance.

23         Q       And did you share your diagnosis

24   of vestibular disturbance or vertigo with anyone

25   at Akoustis?

1          A      I did.

2          Q      And who did you share it with?

3          A      I shared it with Dave, I shared it

4   with Jen, I shared it with Kelly.

5          Q      And when did you share it with

6   Dave?

7          A      One of the days that I couldn't

8   come in because I couldn't drive.  I don't

9   remember the exact date.

10         Q      Was it in May of 2019,

11  approximately?

12         A      I believe that it was, yes.

13         Q      And what was his response?

14         A      I don't recall.

15         Q      You were permitted to take that

16  time off from work?

17         A      Yes.

18         Q      And when did you inform Jen of

19  your diagnosis of vestibular disturbance?

20         A      It was sometime in May.

21         Q      Can you tell me your discussion

22  with Jen?

23         A      I don't recall it.

24         Q      Well, you must have told her that

25  you had this diagnosis, correct?

1          A      Yes, but I don't remember the

2    exact conversation.

3          Q      Okay.  And do you remember what

4    her response was?

5          A      I do not.

6          Q      What about your discussion with

7    Kelly, when did that take place?

8          A      Probably around the same time.

9          Q      Do you recall your discussion with

10   Kelly?

11         A      I do not.

12         Q      When you stopped working in May of

13   2019, was it because of the vertigo or the chest

14   pain?

15         A      It was both.

16         Q      And so can you describe to me --

17   strike that.

18                With regard to the chest pain, did

19   you undergo any -- did you receive any diagnosis

20   or undergo any treatment while you were an

21   employee of Akoustis?

22         A      Well, initially, in February of

23   2019, I went to the emergency room on a weekend.

24   I believe it was February 6th.

25         Q      And did you leave the emergency

1    time that the initial diagnosis was missed, which

2    was in February.  So April, there was a pretty

3    good indication of what it was.  The exact

4    diagnosis did not occur until I believe it was May

5    of 2019.  And that was after numerous tests had

6    been taken.

7         Q    And did you require time off from

8    work to undergo some of these tests?

9         A    Absolutely.

10        Q    And Akoustis provided you with

11    that time off?

12        A    Yes.

13        Q    Do you recall specifically

14    advising Akoustis of your cancer diagnosis?

15        A    I don't remember the exact date,

16    but I do remember having a face-to-face

17    conversation with Dave.  I also spoke with Jen.  I

18    also spoke with Mary Winters.

19        Q    And who is Mary Winters?

20        A    Vice-president of fab operations.

21        Q    Do you recall any specific details

22    of your discussion with Dave about the diagnosis?

23        A    Not specific, no.

24        Q    Do you recall any specific details

25    of your discussion with Jen about the diagnosis?

1          A     Well, I would assume that if a

2     change of venue had been granted, then I would be

3     expected to go to North Carolina to do whatever

4     legalities were necessary.  And this was my

5     doctors saying that that was not advisable.

6          Q     Understood.

7                Now, did there come a time when

8     you requested a formal leave of absence from the

9     company?

10         A     Yes.

11         Q     And when was that?

12         A     I believe it was effective June

13    3rd of 2019.

14         Q     And how did it come about that you

15    requested a formal leave of absence?

16         A     Could you be more specific,

17    please?

18                MR. HARTT:  Form.

19         Q     Sure.  Did anybody direct you to

20    request a formal leave of absence?

21         A     I believe it was discussed between

22    Jennifer Barcarse and me.  I asked her what I

23    needed to do since I was going to be undergoing

24    treatment.

25         Q     And Jen advised you to request a

1    formal leave of absence?

2         A     She did.

3         Q     Did you work with anybody in human

4    resources to request a formal leave of absence?

5         A     I filled out the paperwork and I

6    believe that Jen Barcarse forwarded it on to HR.

7         Q     Give me one moment.  I'm just

8    pulling up some documents.

9              THE WITNESS:  Is Mr. Hartt still

10   with us?

11             MR. HARTT:  Can you not see me?

12             THE WITNESS:  Oh, I can now.  But

13   I couldn't before.  In the little frame, I

14   couldn't, but --

15             MR. HARTT:  Oh, I am.  Yes.

16             THE WITNESS:  Okay.

17        Q     I'll show you a document we'll

18   mark as Exhibit 14.  It bears production numbers

19   Akoustis-Kruly 406 to 408.

20             MS. WIESELTHIER:  For the record,

21   406, 407, 408.

22             (Exhibit 14, Extended Leave of

23   Absence Request, was presented to the witness via

24   screen share.)

25        Q     Ms. Kruly, do you recognize this

1    document?

2           A      I do.

3           Q      And what is it?

4           A      It's the request for a leave of

5    absence.

6           Q      Okay.  And did you complete this

7    form?

8           A      I did.

9           Q      Is this the form that you just

10   testified about in terms of the leave of absence

11   request that you submitted?

12          A      Yes.

13          Q      Let's go back to the top and I'll

14   go more slowly.

15                 Did you have an end date for when

16   the leave of absence was being requested for?

17          A      Not that I recall.

18          Q      And, in fact, in this -- towards

19   the top of the document bearing production number

20   Akoustis-Kruly 406, it says, "Date of leave.  I'm

21   requesting a leave of absence beginning on June 6,

22   2019 and ending on," and the line is blank,

23   correct?

24          A      Yes.

25          Q      So at the time you requested a

1    leave of absence, did you not have an anticipated

2    return-to-work date?

3          A     I did not.

4          Q     Did your doctor provide you with

5    any indication of how much time off from work you

6    would need?

7          A     At that point in time, no.

8          Q     And did Akoustis grant this leave

9    of absence request?

10         A     Yes.

11         Q     I'll show you another document.

12    We'll mark it as Exhibit 15.

13             You know what?  Hold on.  Before I

14    do that, when you took -- when you were approved

15    for a leave of absence, you were advised that it

16    was an unpaid leave of absence, correct?

17         A     Yes.

18         Q     Because you didn't have any paid

19    time off available to you, right?

20         A     Yes.

21         Q     And were you also advised that it

22    was not a job-protected leave of absence?

23         A     I was told that my job may not be

24    there.

25         Q     And who told you that?

1          A       Holly Johnson.

2          Q       Did you have a phone call with her

3     or an in-person meeting where she explained that

4     to you?

5          A       No, it was done via email, a

6     letter.

7          Q       Now I'm going to show you a

8     document we'll mark as Exhibit 15, which has

9     production number Akoustis-Kruly 425.

10                 (Exhibit 15, Letter to Ms. Kruly

11    from Ms. Johnson, dated 6/13/19, was presented to

12    the witness via screen share.)

13         Q       Is this the letter that you're

14    referring to?

15         A       Yes.

16         Q       And in the letter, Holly Johnson

17    advised you, "Although your leave of absence

18    request is approved, we may need to fill your

19    position while you are out and so there's no

20    guarantee that a position will be available upon

21    your return," correct?

22         A       Yes.

23         Q       And you were advised to touch base

24    with her each month to let her know how you were

25    doing and what your anticipated return-to-work

1          Q       During that conversation with
2   Mary, did you inform her of your anticipated
3   return-to-work date?
4          A       There was no anticipated
5   return-to-work date.  I had four rounds of chemo
6   to go through and 37 rounds of radiation.  There
7   was no anticipated time.
8          Q       And did you reach out to anybody
9   else at Akoustis regarding Holly Johnson's letter?
10          A       I believe I sent a copy to Jen
11   Barcarse.
12          Q       And what was Jen's response?
13          A       She could understand why I was
14   upset.
15          Q       Did you have a specific discussion
16   with Jen about the letter?
17          A       Not that I recall.
18          Q       Do you recall discussing the
19   letter with anyone else at Akoustis?
20          A       No.
21          Q       Did you reach out to Ken Boller at
22   all to discuss the letter?
23          A       Not to discuss the letter, I don't
24   believe, no.
25          Q       Did you reach out to Ken Boller

1   for another purpose?

2           A       I believe he did call at one point

3   in time to see how I was doing, and I missed his

4   phone call so I returned the call.

5           Q       Other than discussing how you were

6   doing, is there anything specific that you

7   recollect from your discussion with Ken Boller at

8   that time?

9           A       Not that I recall.

10          Q       Do you recall approximately when

11  this phone call took place?

12          A       I do not.

13          Q       At the time during your discussion

14  with Ken Boller, did you discuss whether or not

15  you had an anticipated return-to-work date?

16          A       I did not.

17          Q       And that's because you did not

18  have one at that time, correct?

19          A       I hadn't even started chemo yet.

20          Q       So you did not have an anticipated

21  return-to-work date, correct?

22          A       That is correct.

23          Q       Okay.  At some point during this

24  leave of absence, did your health insurance

25  coverage change?

1          Q     And do you recognize this

2    document?

3          A     Yes.

4          Q     And these are emails exchanged

5    between you and Dave Pettitt on July 3, 2019?

6          A     Yes.

7          Q     And is this an example of you

8    checking in with Dave to provide a status update

9    while you're out on your leave of absence?

10         A     Yes.

11         Q     And at this time, did you have a

12   return-to-work date?

13         A     I did not.

14         Q     I'm going to show you a document

15   we'll mark as Exhibit 19.  It's production numbers

16   Akoustis-Kruly 638 to 639.  I'll give you a minute

17   to review.

18               (Exhibit 19, Email chain between

19   Ms. Kruly and Mr. Pettitt, dated 7/20/10 and

20   7/21/19, was presented to the witness via screen

21   share.)

22         Q     I don't know if it's more helpful

23   for me to scroll down to start at the original

24   email.  Let me know.

25               But my question to you is:  Do you

 1    recognize this document?

 2              A     Can you scroll down, please?

 3                    Scroll down, please.

 4                    Okay.

 5              Q     And do you recognize this

 6    document?

 7              A     I do.

 8              Q     And these are emails that you

 9    exchanged with Dave Pettitt on July 20th and 21st,

10    2019?

11              A     Yeah.

12              Q     And is this another example of you

13    providing him with an update regarding your

14    status?

15              A     Yes.

16              Q     And as of the date of this email,

17    July 20, 2019, did you have an anticipated

18    return-to-work date?

19              A     No, I still had two more rounds of

20    chemo to go and I hadn't started radiation yet.

21              Q     I'm going to show you another

22    document we'll mark as Exhibit 20.  It bears

23    production number Akoustis-Kruly 642.

24                    (Exhibit 20, Email from Ms. Kruly

25    to Mr. Pettitt, dated 8/8/19, was presented to the

1   witness via screen share.)

2           Q       Take a minute to review and let me

3   know if you recognize this document.

4           A       Okay.

5           Q       Do you recognize this document?

6           A       I do.

7           Q       And is this another example of an

8   update that you provided to Dave Pettitt regarding

9   your status?

10          A       Yes.

11          Q       And as of this date, August 8,

12  2019, did you have an anticipated return-to-work

13  date?

14          A       Did not.

15          Q       Okay.  We'll go back to Exhibit 17

16  which we were just looking at a few moments ago

17  bearing production number 644 and you had

18  testified that you recognize this document.

19                  As of the date of this email,

20  August 19, 2019, did you have an anticipated

21  return-to-work date?

22          A       Did not.

23          Q       Did your doctor give you any

24  indication as to an estimate of when you may be

25  available or able to return to work?

1              A       They did not.

2              Q       I'm going to show you another

3     document that we'll mark as Exhibit 22.  I'm

4     sorry.  21, we're up to.  This is a document

5     bearing production number Akoustis-Kruly 486.

6                      (Exhibit 21, Email from Ms. Kruly

7     to Ms. Shealy, dated 8/19/19, was presented to the

8     witness via screen share.)

9              Q       Do you recognize this document?

10             A       Yes.

11             Q       And what is this document?

12             A       There was an issue with my blood

13    work.  They had to delay the fourth round of chemo

14    and they also had to hold off on radiation due to

15    the blood work being not where it was supposed to

16    be.

17             Q       And you summarized that in an

18    email to Lora Shealy on August 19, 2019?

19             A       I did.

20             Q       And why did you send this email to

21    Lora Shealy on August 19, 2019?

22             A       I was just doing my due diligence

23    to keep people advised of what was going on.  I

24    made it a point to keep everyone in the loop.

25             Q       And Lora Shealy is within HR,

1    correct?

2              A      That is correct.

3              Q      Did you have any further

4    discussion with Lora Shealy after you sent this

5    email?

6              A      I believe she asked me when I

7    thought I could come back to work, and I told her

8    I had no idea because I didn't at that point in

9    time and neither did my doctors.

10             Q      And was that a conversation you

11   had via email?

12             A      It was.

13             Q      Do you recall speaking with her on

14   the phone at all?

15             A      Not at that point in time, no.

16             Q      Do you recall telling Lora Shealy

17   in response to your question as to when you may be

18   able to return to work that you, quote, wouldn't

19   even dare to guess?

20             A      That is due to the delay in the

21   fourth chemo round and the delay in the radiation.

22   It was not -- it was not anything other than that.

23             Q      But you did say to her that you

24   wouldn't even dare to guess when you may be able

25   to return to work?

1          A       I wouldn't, because even my

2     doctors couldn't do that.

3          Q       My question's a little different.

4                  Did you say that to Lora Shealy,

5     is my question.  Did you say to her that you

6     wouldn't even dare to guess?

7          A       I believe those were the words

8     that were used in the email, yes.

9          Q       Okay.  Did there ever come a point

10    in time when you did actually have an anticipated

11    return-to-work date?

12         A       Yes, December 1st of 2019.

13         Q       And when did you learn that you'd

14    be able to return to work as of December 1, 2019?

15         A       It was a couple of months after my

16    treatments were finished.

17         Q       Do you recall approximately when

18    that was?

19         A       I do not.

20         Q       When did your treatments finish?

21         A       The end of September of 2019.

22         Q       And what treating professional in

23    particular informed you that you'd be able to

24    return to work on December 1, 2019?

25         A       Dr. Brassachio, who was the

1    radiology oncologist, and Dr. Dirk Bernold, who

2    was the oncologist.

3              Q      And did there come a time when you

4    informed Akoustis of this December 1st

5    return-to-work date?

6              A      Yes, I sent the doctor's notes

7    right to Lora Shealy.

8              Q      I'm going to mark another exhibit

9    as 22, bearing production numbers Akoustis-Kruly

10   497 to 499.

11             (Exhibit 22, Email to Ms. Shealy,

12   dated 9/13/19, with attachments, was presented to

13   the witness via screen share.)

14             Q      Ms. Kruly, do you recognize this

15   document?  And I'll scroll down to the

16   attachments.

17             A      Yes.

18             Q      And what is this document?

19             A      The two letters that I spoke of

20   from both of my physicians releasing me back to

21   work as of December 1, 2019.

22             Q      Okay.  And you shared these with

23   Lora Shealy on September 13, 2019?

24             A      Yes, I did.

25             Q      And the first letter,

1    Akoustis-Kruly 498, from Dr. Brassachio, if I'm

2    saying that correctly, is a September 5, 2019

3    letter?

4              A      Uh-huh.  Yes.

5              Q      And it provides a return-to-work

6    date of December 1, 2019?

7              A      Yes.

8              Q      Did you discuss with Dr.

9    Brassachio whether or not you had any restrictions

10   on your ability to return to work?

11             A      That was discussed, actually, with

12   Dr. Bernold's nurse practitioner.

13             Q      And is Dr. Bernold's nurse

14   practitioner Susan Zumbo?

15             A      Yes, it is.

16             Q      Okay.  And on Akoustis-Kruly 499

17   is a September 10, 2019 letter signed by Susan

18   Zumbo, nurse practitioner?

19             A      Yes.

20             Q      And this provides a return-to-work

21   date of December 1, 2019?

22             A      Yes.

23             Q      And you stated that you had

24   discussed with Ms. Zumbo whether you required any

25   restrictions with regard to your return to work?

1          A     Yes.  There was also a letter from

2     her regarding that issue, also.

3          Q     Do you have a copy of that letter?

4          A     I do, but not in front of me.

5               MS. WIESELTHIER:  I'm not certain

6     that that letter has been produced in discovery.

7     I'm just going to put a notation on the record

8     that it wasn't produced previously.  And if it

9     was, if counsel can assist me in locating that

10    document.

11         Q     So the letter from Ms. Zumbo with

12    restrictions, do you recall what the restrictions

13    were?

14         A     A 30- to 32-hour workweek.  Other

15    than that, I don't recall what else she had in

16    there, but I know the time frame was specific.

17         Q     And did you provide the

18    information regarding potential restrictions to

19    Lora Shealy at the time you provided the

20    return-to-work date?

21         A     Yes, I did.  I don't know if it

22    was that same day or not, but it was certainly

23    forwarded on to her.

24         Q     So this email you sent to Lora

25    Shealy was the first time that you had advised

1    Akoustis of a return-to-work date, correct?

2              A      Yes.

3              Q      And what was Lora Shealy's

4    response when you sent her that letter?

5              A      Received.  Thank you.

6              Q      Did you have any further

7    discussions with Lora Shealy regarding your return

8    to work?

9              A      Not at that point in time, no.

10             Q      Okay.  At what point in time did

11   you have a discussion with Lora Shealy about your

12   return to work?

13             A      Actually, I requested a phone

14   conversation with her towards the end of November

15   of 2019.

16             Q      Between your email in September

17   and the request for a phone call the end of

18   November 2019, did you have any communications

19   with Lora Shealy regarding your return to work?

20             A      Not that I recall.

21             Q      Did you advise anybody else other

22   than Lora Shealy of your anticipated

23   return-to-work date of December 1st?

24             A      Not that I recall.

25             Q      Why did you request a phone call

1    with Lora Shealy towards the end of November 2019?

2         A     I don't remember the specifics of

3    that.  I just wanted to speak with her to let her

4    know I was ready to come back.

5         Q     And did you end up speaking with

6    her?

7         A     I did.

8         Q     And do you recall when?

9         A     I don't remember the first phone

10   call, but I know there was a second one on

11   November 21st.

12        Q     The first phone call in November

13   that predated the November 21st phone call, who

14   were the participants in the phone call?

15        A     It was myself and Lora.

16        Q     What was discussed on that phone

17   call?

18        A     I don't recall the conversation.

19        Q     Was it at that time that you

20   informed Ms. Shealy about your restriction of

21   working only 30 to 32 hours per week?

22        A     I had sent that to her prior.

23        Q     Did you discuss the restriction at

24   all with her during that phone call?

25        A     I don't recall if I did or not.

1          Q      The job you had been performing

2    for Akoustis as an accounts payable specialist,

3    that was a full-time, 40-hour week position,

4    correct?

5          A      Correct.

6          Q      Did you ever work overtime in that

7    role?

8          A      When it was allowed.  But it

9    wasn't allowed very often.

10         Q      And the job duties and

11   responsibilities of an accounts payable

12   specialist, you needed 40 hours a week to get

13   those job duties done, correct?

14         A      I don't know that specifically.

15         Q      Well, it wasn't a part-time role?

16   It was something that needed a full-time person,

17   correct?

18         A      Correct.

19         Q      And you don't recall anything else

20   from your phone call with Lora -- that first phone

21   call in November with Lora Shealy?

22         A      I don't.

23         Q      And you said there was a second

24   phone call that occurred on November 21st?

25         A      Yes.

1          Q       And who participated in the

2     November 21st phone call?

3          A       Myself and Lora Shealy.

4          Q       And what do you recall of that

5     discussion on November 21st with Lora Shealy?

6          A       Pretty much the thing that sticks

7     in my mind is that she told me that there was no

8     position for me to come back to.

9          Q       Do you recall anything else that

10    was said during that call?

11         A       Not specifically, no.

12         Q       Did she explain why there was no

13    position for you to go back to?

14         A       She attempted to.

15         Q       Do you recall what she said?

16         A       I do not, but it wasn't very

17    clear.

18         Q       And why wasn't it clear?

19         A       It just didn't seem like she had a

20    lot of information to divulge at that time.

21                 THE WITNESS:  Would it be possible

22    sometime soon if we can break for lunch?

23                 MS. WIESELTHIER:  I was just going

24    to say, I have a couple more questions on this

25    topic and then perhaps we can take a lunch break.

1          Q      If it was offered to you, would

2     you have relocated to North Carolina to continue

3     in that accounts payable specialist role?

4          A      Probably not, due to the fact that

5     my doctors are all up here, which I'm still having

6     to, you know, see them periodically.

7          Q      The First Amended Complaint

8     alleges a claim of disability discrimination under

9     the Americans with Disabilities Act and the New

10    York City Human Rights Law, correct?

11         A      Yes.

12         Q      In what way do you believe that

13    Akoustis discriminated against you on the basis of

14    your disability?

15         A      Well, it's my understanding of

16    that law that there should be accommodations made

17    to someone with a disability when they're ready to

18    return to their job.  And those accommodations

19    were not provided.

20         Q      Well, you were provided with an

21    unpaid leave of absence from June 3, 2019 through

22    November 21, 2019, correct?

23         A      Yes.

24         Q      All right.  Did you make any other

25    requests for an accommodation during that time?

1    provide -- directly speak with anyone at Akoustis
2    regarding that request?
3              A       No, no indication that that was
4    needed.
5              Q       I just want to make sure I
6    understand your testimony.
7                     It's your testimony that in
8    addition -- that separate from the leave of
9    absence that you were provided as an
10   accommodation, you also required an accommodation
11   for a reduced work schedule of 30 to 32 hours a
12   week, correct?
13             A       On behalf of my physicians who I
14   was under the care of.
15             Q       Right.  But you as an employee
16   wanted -- I understand that the limit on the
17   number of hours you could work was imposed by your
18   doctor, but my question was a little bit
19   different.  I just want to clarify or make sure I
20   understand your testimony about this reduced work
21   schedule.
22                    So you had requested a leave of
23   absence from the company from June 3rd which ran
24   from June 3rd through November 21, 2019, correct?
25             A       It actually ran to December 1st.

1      Q      Sorry.  So it ran through December

2  1st.

3           And that was a request for an

4  accommodation of a leave of absence that you had

5  made, correct?

6      A      Yes.

7      Q      And the company provided you that

8  accommodation, right?

9      A      Yes.

10     Q      Did you make a separate request

11 for an accommodation of a reduced work schedule

12 for 30 to 32 hours per week to anyone at Akoustis?

13     A      I did not.

14     Q      Okay.  Additionally, the First

15 Amended Complaint alleges that the company failed

16 to accommodate you, in violation of the Americans

17 with Disabilities Act and New York State Human

18 Rights Law.  Other than what you just testified

19 to, is there any other information that forms the

20 basis of your belief that the company failed to

21 accommodate you?

22     A      Going back to your previous

23 question, I don't really believe that I had the

24 opportunity or the chance to request a reduced

25 work schedule due to the fact that I was told on

1 up to me as to how I was feeling and what my

2 fatigue level was. That said that they would

3 leave it to up to me at that point in time.

4      Q    You're saying there was a point in

5 time you wanted them to lift the restriction?

6      A    They told me that to basically

7 play it by ear. If my fatigue level had leveled

8 off and everything was getting back to somewhat

9 normal, then to feel free to do what I felt that I

10 needed to do if that meant working more than 32

11 hours a week.

12      Q    Okay. Sitting here today, do you

13 think you are capable of working a 40-hour

14 workweek?

15      A    I'm not really sure how to answer

16 that because I haven't done it in a while. It

17 probably would take a little bit to get back up to

18 speed, to be honest.

19      Q    Okay. The COBRA payments that are

20 listed here, this is related to the COBRA benefits

21 that you received following your separation of

22 employment with Akoustis?

23      A    That's the COBRA payments that I

24 paid out-of-pocket to continue my insurance

25 coverage while I was going through treatment.

1                              CERTIFICATE

2

3                I, BARBARA A. BRADEY, a Notary Public

4      and Certified Court Reporter of the State of New

5      Jersey, License No. 30XI00202900, do hereby

6      certify that prior to the commencement of the

7      examination, the Witness, MARLENE A. KRULY, was

8      duly sworn by me to testify the truth, the whole

9      truth and nothing but the truth.

10                I DO FURTHER CERTIFY that the foregoing

11     is a true and accurate transcript of the testimony

12     as taken stenographically by and before me at the

13     time, place and on the date hereinbefore set

14     forth.

15                I DO FURTHER CERTIFY that I am neither

16     a relative nor employee nor attorney nor counsel

17     of any of the parties to this action, and that I

18     am neither a relative nor employee of such

19     attorney or counsel, and that I am not financially

20     interested in the action.

21

22

23     *Barbara A. Bradey*

24     Notary Public of the State of New Jersey

        My Commission expires June 30, 2022

25     Dated:  February 25, 2022

# EXHIBIT 6

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF NEW YORK

3    -----------------------------------------------

4    **MARLENE A. KRULY,**

5            Plaintiff,

6    -vs-                    Index No. 21-CV-6181G

7    **AKOUSTIS TECHNOLOGIES, INC.,,**

8            Defendant.
     -----------------------------------------------

9

10

11   **EXAMINATION BEFORE TRIAL OF KENNETH BOLLER**

12              **APPEARING REMOTELY FROM**

13              **CHARLOTTE, NORTH CAROLINA**

14

15

16              July 1, 2022

17              At 9:30 a.m.

18              Pursuant to notice

19

20   REPORTED BY:

21   Brooklyn Morton, Notary Public

22   APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

23

1    A. So accounts payable was then done in New York

2       and checks were cut here in North Carolina.

3    Q. And to be clear, when you talk about the two

4       different systems, QuickBooks and Sage, that

5       wasn't just for accounts payable.  That was

6       for all accounting, correct?

7    A. Yes.

8    Q. Okay.  So when accounts payable was combined

9       to be done in New York, there was nobody doing

10      accounts payable in North Carolina?

11    A. Correct.

12    Q. What happened to the person who was doing

13      accounts payable in North Carolina when the

14      function was moved to New York?

15    A. That person was an accounting

16      supervisor/manager type of role.  So they had

17      other accounting work, not clerical work.

18    Q. What's the name of that person?

19    A. It's Thomas Sloan.

20    Q. When the function was combined in New York,

21      who was doing the work in New York?

22    A. Marlene.

23    Q. When you got there, who was doing the work in

1    combination of the systems, QuickBooks and

2    Sage, to have that function performed in New

3    York.  When did that happen?

4  A. June 2018.

5  Q. And you said the transition back to North

6    Carolina happened in August, September of

7    2019?

8  A. Correct.

9  Q. Okay.  When did the discussion begin about

10    transitioning the accounts payable function

11    from New York to North Carolina?

12  A. I am not certain of the exact date, but spring

13    of 2019.

14  Q. How did that discussion begin?

15  A. Well, we were in the process of putting a lot

16    of different controls in place because my role

17    initially was to bring structure to the

18    company, a number of different initiatives and

19    polices and procedures, the chief one being

20    getting on one system.  I made a number of

21    improvements over that next six to

22    nine months.  In my experience, the accounts

23    payable role has always been sort of a shared

1    services role around the corporate area.

2  Q. I am sorry.  What did you say before

3    corporate?

4  A. A shared services type of role.

5  Q. What do you mean by that?

6  A. It's where a service is performed that

7    benefits the full entire company, but out of

8    one central location either in its own shared

9    services operation department within --

10   typically within corporate headquarters.

11 Q. So after June of '18 who do you recall being

12   the first person to begin a conversation about

13   potentially moving the function to North

14   Carolina?

15 A. Myself.

16 Q. Okay.  And who was the first person you recall

17   talking to about that subject?

18 A. Dave Pettitt.

19 Q. Okay.  Was anybody else involved in that

20   initial conversation?

21 A. He then, I believe, had a conversation with

22   Mary Winters.

23 Q. Okay.  Well, let's stick first with the

1    conversation you had with Dave.  What do you
2    recall about that conversation?
3  A. That I would like to move the position to
4    North Carolina for him to solicit -- get his
5    input and also, solicit Mary's input as VP of
6    the New York location.
7  Q. And was that conversation in person or by
8    phone?
9  A. Initially by phone and then by email.
10 Q. Okay.  What else do you recall about the
11   initial telephone conversation?
12 A. Nothing.
13 Q. How long did the conversation last?
14 A. I don't know.
15 Q. I am sorry.  I am not hearing you, sir.
16 A. I don't know.  I don't remember.
17 Q. What was Dave's reaction to the suggestion of
18   moving the function to North Carolina?
19 A. Initially we were trying to weigh the pros and
20   cons and he was trying to layout some of the
21   pros and cons of the position being in one
22   location versus the other.  There was also
23   input from Mary on morale type of suggestions

1   A. I seem to recall agreeing in general and I

2      think his consensus was more along the line of

3      it would work in either location.

4   Q. And you agreed with that assessment?

5   A. Yes.  Functionally it would work.

6   Q. What was the reason why you were suggesting to

7      Dave to move the position to North Carolina?

8   A. So some of the reasons were to allow Dave to

9      perform his role as plant controller, try to

10     get him away from the accounts payable part of

11     his job moving it to Andrew who was a manager

12     down here.  Part of it was that was the model

13     that I am used to.  As I mentioned earlier,

14     that role is more of a corporate function or

15     shared services function.  We were also

16     cutting checks out of North Carolina, another

17     part of his role outside of the function, I

18     guess.

19  Q. Any other reasons?

20  A. It just allows us to have more control of the

21     process and especially at that time, we were

22     struggling to bring control a lot of different

23     processes and procedures throughout the

1    company.

2    Q. At any point in time since the function moved

3       to North Carolina, has Dave Pettitt overseen

4       accounts payable?

5    A. Yes.

6    Q. When was it that Dave oversaw accounts payable

7       after the move to North Carolina?

8    A. So Andrew managed accounts payable after that

9       August, September 2019 timeframe and I don't

10      recall the exact time when Andrew left the

11      company.  He was no longer part of the company

12      I want to say summer, spring of 2020.  I would

13      have to check my records on that and when

14      Andrew left, Dave unfortunately had assumed

15      the role again.

16   Q. So since the spring, summer of 2020 Dave has

17      been supervising accounts payable?

18   A. Yes.

19   Q. Was Tom Sloan still with the company in the

20      spring or summer of 2020?

21   A. No.

22   Q. When did he leave?

23   A. Spring, summer of 2018.

1    A. When I first joined, I don't recall at this

2       time.

3    Q. Currently, is it more New York or more North

4       Carolina?

5    A. I don't know.

6    Q. Any other reasons that you can recall?

7    A. Not that I recall at this moment.

8    Q. In the spring of 2019 when you first had the

9       conversation with Dave, what role, if any, did

10      Marlene's job performance have on the

11      discussion of moving the job to North

12      Carolina?

13    A. I don't recall much discussion on that.

14    Q. You mentioned that Mary was concerned about

15      morale because Marlene was in and out because

16      of her illness.  Do you recall what Marlene's

17      status was at the time of this conversation

18      with Dave and when Mary provided her input?

19    A. I don't know if I knew what that was at that

20      time.

21    Q. When did you first learn that Marlene had some

22      kind of health issue?

23    A. Not certain.  Timeframe, summer of 2019,

1           spring, summer.

2       Q. Who was it that told you that information?

3       A. I don't remember.

4       Q. What was your understanding as to what the

5           health issue was when it first came to your

6           attention?

7       A. That it was some form of cancer, is what I

8           recollect.

9       Q. Did there come a point in time when Ms. Kruly

10          was out of work for an extended period of time

11          because of her cancer?

12      A. I know there was a substantial amount of days

13          off for sickness and at some point in time a

14          leave of absence.

15      Q. So my question is, the conversation that you

16          first had with Dave and then when Mary

17          provided her input, was it your understanding

18          that at that point in time Marlene was already

19          on her leave of absence or was it before that?

20      A. It was before that.

21      Q. When Marlene went on her leave of absence,

22          what part along the timeline were you in terms

23          of the decision to move the position to North

1         Carolina?

2    A.  Can you say that again?

3    Q.  Sure.  At the point in time when Marlene went

4         on her leave of absence, at what point were

5         you along the timeline of moving the position

6         to North Carolina?

7    A.  So that was after my initial discussions with

8         Dave, but no decision had been made as of yet.

9         So no decision was made to move or to not

10        move.

11   Q.  Okay.  So I asked you in terms of the list of

12        reasons for the move about Marlene's job

13        performance and you said that there wasn't

14        discussion about that.  What discussion, if

15        any, was there about the fact that Marlene was

16        on a leave of absence in connection to moving

17        the job to North Carolina?

18   A.  I recall just making sure that we reached out

19        to the relevant HR experts, legal counsel on

20        what is proper, what's allowed or not allowed

21        making sure that we were covered.

22   Q.  Who were the HR experts that you reached out

23        to?

1       to North Carolina?

2   A.  I don't recall any specifics again, but yes.

3   Q.  And other than the fact that you had a

4       conversation, is there anything in general

5       about the conversation without specifics that

6       you do recall?

7   A.  Just in general that we could move the

8       position.

9   Q.  Now, at the time that Marlene went out on her

10      leave of absence, your testimony is the

11      decision had not yet been made about the move.

12      Was there discussion with Dave about how to

13      accomplish the accounts payable function while

14      Marlene was on leave of absence in the short

15      term?

16  A.  I don't recall specifics, but yes.

17  Q.  Well, the day Marlene went on her leave of

18      absence, who was doing accounts payable when

19      she was gone?

20  A.  Dave.  Dave had assumed the function any time

21      Marlene was out throughout her tenure with

22      Akoustis and then after her leave.

23  Q.  So there was a period of time from when

1    Marlene went out until Kristin was hired,

2    correct?

3 A. Yes.

4 Q. Okay.  So when Marlene first went out or at

5    some point thereafter did Dave say to you, you

6    know, I really can't do the accounts payable

7    myself in addition to all my jobs, I need help

8    in words or substance?

9 A. In substance, yes.

10 Q. And what was the conversation about how to

11    provide him that help?

12 A. That we would seek assistance first in the

13    form of a temporary role so that he could

14    perform what he is really meant to do, his

15    day-to-day work as controller.

16 Q. Was there any discussion about hiring a temp

17    for Dave in New York?

18 A. I don't recall.

19 Q. Okay.  Was there any discussion about

20    accelerating the timeline about making a

21    decision concerning moving the job to North

22    Carolina?

23 A. I don't recall.

1       you are used to, the checks being in North

2       Carolina, the opportunity for more control if

3       the function was performed in North Carolina,

4       none of those reasons would be inconsistent

5       with Marlene continuing to perform the

6       function if she was in North Carolina,

7       correct?

8   A. Correct.

9   Q. But, you don't recall any conversation about

10      the possibility of having her do so?

11   A. No specific conversation I recall.

12   Q. Even any general conversations?

13   A. No.

14   Q. So the decision to move the position to North

15      Carolina had not yet been made at the point in

16      time when Marlene went out on a leave of

17      absence.  Was the decision to move the

18      position to North Carolina made before Kristin

19      was hired as a temp?

20   A. Yes.

21   Q. So why wasn't Kristin just hired as a regular

22      employee then?

23   A. I don't recall.

1    Q. Do you recall any discussion about whether she

2       was going to be hired as a temp versus an

3       employee?

4    A. Not that I recall.

5    Q. Who was it who actually made the decision to

6       move the position to North Carolina?

7    A. Ultimately it would have been me to sign off

8       on it.

9    Q. Did anybody else have any yes or no decision

10      power other than you?

11   A. There would have been input from Dave and from

12      Andrew.

13   Q. And other than their input, anybody else that

14      would have input?

15   A. Input from HR and Mark Burgess, counsel.

16   Q. And once you got all of that input, it was

17      your decision to make?

18   A. Yes.

19   Q. And so let's go through those.  Did Dave

20      express a yes or no concerning the move to

21      North Carolina?

22   A. I don't recall specifically.

23   Q. I know you testified earlier that Dave said

1    Q. Okay.  So once the decision was made to move

2       the position to North Carolina, why wasn't

3       Ms. Kruly separated from employment at that

4       point in time?

5    A. I believe she was on a leave of absence at

6       that time.

7    Q. Okay.  Why would the company have continued to

8       solicit from Ms. Kruly whether and when she

9       would be returning -- approved to return to

10      work?

11    A. I don't know all the rules and regulations and

12      requirements for something like that.  I don't

13      know.

14    Q. Once Kristin was hired, there was no accounts

15      payable position for Ms. Kruly to return to in

16      New York, correct?

17    A. Yes.

18    Q. Okay.  At that point in time once Kristin was

19      hired, were you aware of any other positions

20      in New York that Ms. Kruly could have filled

21      if she was cleared to return to work?

22    A. I don't know what positions were open around

23      that time period.

1    payable position?

2  A. Yeah.  It would depend on the workload and

3    what it was then and what it is, what it

4    migrated to, but the workload would -- I would

5    say yes.  We don't have a history of many of

6    that, but it is something we could look into.

7  Q. Okay.  In 2019 based on the workload as you

8    understood it from Marlene and/or from Dave

9    Pettitt, is that something that you thought an

10    employee working 30 to 32 hours could get

11    enough of that job done to be worth

12    accommodating that restriction?

13  A. I don't know what the workload was in 2019.

14  Q. I think you testified earlier about the

15    workload when Dave said that he needed help

16    when Marlene went out.

17        Did you have an understanding from Dave

18    at that point in time that the position needed

19    40 hours or more to get the work done?

20  A. I don't know the level of hours needed for

21    that role at that time.

22  Q. Okay.  A medical restriction that an employee

23    be able to work from home, is that something

1        printer/scanner at home?

2    A. Yes.

3    Q. I am sorry?

4    A. Yes.

5    Q. Okay.

6    A. I don't know about security at that time and

7        what was, you know, available only at the

8        office or at home, but we could have given her

9        a printer and a scanner.

10   Q. What printing did Mary have to do -- Marlene

11       have to do in connection with the accounts

12       payable function?

13   A. I don't know all the details, but printing

14       invoices, getting signatures and approvals and

15       getting proper support, putting together

16       three-way and it be properly approved.  So

17       just compiling like a package.

18   Q. The approvals, those could be provided

19       electronically via email from the relevant

20       person authorizing the expenditure?

21   A. They can, yes.  At the time, that was not our

22       general process.

23   Q. So at that point in time Marlene was doing the

STATE OF NEW YORK)

           ) ss.

COUNTY OF ERIE   )


  I, Brooklyn Morton, Notary Public, in and for the County of Erie, State of New York, do hereby certify:

  That the witness whose testimony appears hereinbefore was, before the commencement of their testimony, duly sworn to testify the truth, the whole truth and nothing but the truth; that said testimony was taken pursuant to notice at the time and place as herein set forth; that said testimony was taken down by me and thereafter transcribed into typewriting, and I hereby certify the foregoing testimony is a full, true and correct transcription of my shorthand notes so taken.

  I further certify that I am neither counsel for nor related to any party to said action, nor in anyway interested in the outcome thereof.

  IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal on this 19th day of July, 2022.

*Brooklyn Morton*

----------------------
Brooklyn Morton

# EXHIBIT 7

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF NEW YORK

3    ------------------------------------------------

4    **MARLENE A. KRULY,**

5                    Plaintiff,

6     -vs-                      Index No. 21-CV-6181G

7    **AKOUSTIS TECHNOLOGIES, INC.,**

8                    Defendant.
     ------------------------------------------------

9

10        **EXAMINATION BEFORE TRIAL OF DAVID PETTITT**

11                **APPEARING REMOTELY FROM**

12                **CANANDAIGUA, NEW YORK**

13

14

15                    June 24, 2022

16                  9:32 a.m. - 1:00 p.m.

17                   pursuant to notice

18

19

20    REPORTED BY:

21    Carrie A. Fisher, Notary Public

22    APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

23

1       little bit.  If you don't hear or understand a

2       question that I ask, just say so.  I will

3       repeat the question or rephrase the question

4       as is necessary.  If you don't raise a concern

5       about a question, we're going to assume that

6       you understood it; is that fair?

7    A. That's fair.

8    Q. Okay.  If at any point in the time this

9       morning you need to take a break, just say so

10      and we'll take a break.  I would just ask that

11      if there is a question pending that you answer

12      the question first and then we'll take a

13      break, okay?

14   A. Yes.

15   Q. Okay.  When did you join Akoustis?

16   A. I joined Akoustis November 2017.

17   Q. And when you joined, what was your position?

18   A. Plant financial controller.

19   Q. And what is your current title?

20   A. Plant financial controller.

21   Q. Okay.  If you could, take me through your post

22      secondary employment up through Akoustis.

23   A. So I have a bachelor's degree in math and a

1        accounts payable from New York to North

2        Carolina take, over what period of time?

3   A.  I only put the -- I was asked for input as to

4        does it matter having it North Carolina versus

5        New York, and I replied to that.  How long it

6        took after that you would have to -- I was not

7        part of the discussion of whether or not to

8        move it to North Carolina.  I was just part of

9        the input to say here is the pluses and

10       minuses of moving it or keeping it in the same

11       location.

12  Q.  Who did you give that input to?

13  A.  I would have given it to Ken Boller.  If they

14       copied in HR, I don't recall but the email

15       correspondence would give you that answer.

16  Q.  After you gave the input and then you were not

17       part of the discussion, who was it who got

18       back to you and told you what the decision

19       was?

20  A.  Ken Boller.

21  Q.  And do you recall how long it was from the

22       time you gave your input to Ken to when Ken

23       got back to you and told you what the decision

1      was?

2   A. I don't recall the exact day that -- or

3      timeframe that Ken let me know that that was

4      the decision.

5   Q. Okay.  And then after Ken told you what the

6      decision was, how long did it take to

7      implement that change?

8   A. I don't know how long it took them to locate

9      the temporary employee in North Carolina, so I

10     can't really answer that question.

11  Q. Okay.  So just again to try to get the

12     sequence of events, the decision was made to

13     move the position to North Carolina and at

14     that point in time the temp was hired; is that

15     correct?

16  A. That would make sense.  Otherwise, you

17     wouldn't hire somebody in North Carolina if

18     you weren't planning on moving it.

19  Q. Well, I guess when the temp was hired

20     initially, was the plan that the temp was

21     hired to fill in for Marlene or was the plan

22     that the temp was hired for the new position

23     in North Carolina?

1    A. You'd have to talk with Ken and HR.  I was not

2       part of that discussion.

3    Q. Did you talk to Ken or HR about getting a temp

4       when Marlene went out?

5    A. I had a discussion that said I need some help,

6       yes.  That part was discussed.

7    Q. When Marlene went out, who did the accounts

8       payable function initially?

9    A. Myself.

10   Q. How long were you doing it before they got the

11      temp?

12   A. You'd have to go back to the timeframe of

13      Marlene's absences and look at the date of

14      when the temp was hired and that change would

15      be what I did, so I would defer to that

16      timing.

17   Q. Is it your recollection that that was a period

18      of weeks or a period of months?

19   A. I would say -- so it gets a little bit cloudy

20      because prior to Marlene officially going out

21      she -- she had attendance issues prior to that

22      which I also had to cover, so I don't know the

23      exact timeframe that way but...

1       discussion with greater granularity as to why

2       the attendance rate was what it was.

3  Q. Sitting here today, do you have a recollection

4       of talking anything more specific about

5       attendance?

6  A. Outside of that the attendance was low, I

7       don't recall having discussions about --

8       specifically about medical if that's what

9       you're asking.

10  Q. Right, okay.  Now there is a reference here to

11      a meeting with -- on May 13th with you and Ken

12      regarding Marlene and perhaps Holly if she was

13      the author.  Do you recall having the meeting

14      at least with Ken on May 13th regarding

15      Marlene?

16  A. I don't specifically recall that meeting, but

17      I meet with Ken frequently.

18  Q. Well, there is a reference here to "Ken would

19      like to move AP back to corporate."  Do you

20      see that reference there on the May 13th?

21  A. Yep.

22  Q. Do you recall Ken telling that to you?

23  A. I recall the discussion in the email I sent in

1     regards to having the position in North

2     Carolina versus New York.  That's probably

3     within that timeframe, but I don't know the --

4     I don't recall the specific dates.  You'd have

5     to go back to kind of that correspondence.

6   Q. As of May 13th, did you have an opinion one

7     way or the other -- and, again, just reminding

8     you of the timeline, it wasn't until June 11th

9     that Marlene put in that email indicating that

10    she was going to be out for a block of months.

11    As of May 13th, did you have an opinion as to

12    whether or not the AP function should be in

13    New York or North Carolina?

14  A. So there is an email from me to Ken.  Do you

15    have that exhibit regarding the move

16    potentially to North Carolina versus New York?

17  Q. Yeah, yeah, I have that.  I'm not done with

18    this document but that's fine.  Let's move to

19    that one.  We will mark as Exhibit 47 what was

20    produced as Akoustis-Kruly 379.

21       Okay.  Is this the email you were just

22    talking about?

23  A. Yeah, that looks like it.  This was on the

1    New York."  Now a few moments ago it sounded

2    like you were saying that was really more Mary

3    and that you didn't share that sentiment, so

4    why did you write in that email that you both

5    feel that way about the move?

6          MS. WIESELTHIER:  Objection to form.

7    You can answer the question.

8  A.  I think my feeling was more I can understand

9    Mary's view and so I would agree that given --

10    given that the recent medical situation, which

11    wasn't just known by me or just by me and Mary

12    but it was a known by many people within the

13    company, within New York, that I can certainly

14    see that the optics would potentially generate

15    negative morale in New York.

16  Q.  Now, you say -- sorry, you say in the email

17    that there was some discussion about the

18    ability to work remotely and that it was not

19    something that at least as of May of 2019 you

20    didn't think was conducive to working remotely

21    given the amount of printing, scanning, and

22    direct contact needed.  Would you say today

23    that you've learned that in fact that job

1    could be done remotely?

2  A. Given the enhancements and implementations and

3    discussions with vendors such that we've now

4    gotten a lot higher percentage of invoicing

5    electronically and we have some through

6    continuous improvement measures and have

7    better scanning and ability to save things on

8    SharePoint, the role of accounts payable could

9    be done potentially remotely with periodic

10    office visits to pick up invoicing that took

11    place.  We found that through the pandemic

12    where the -- I would come in just weekly to

13    grab and the accounts payable person in North

14    Carolina would come in weekly to obtain hard

15    copy invoices to handle and everything else

16    was done from home during the pandemic.

17  Q. So you already had in place before the

18    pandemic as it related to the periodic plant

19    shutdowns the ability to work remotely,

20    correct?

21  A. We had the ability to work remotely on our PCs

22    and what not, yes, but the percentage of

23    invoices coming in through manual mail was

1  much higher.  And so even during shutdown, the

2  shutdown period is only maybe four days so,

3  you know, you come back four days later and

4  you could get back to work.  In terms of

5  getting those caught up, those invoices,

6  though a shutdown is not -- the pandemic was

7  obviously a much different situation because

8  it was longer term.

9  Q. You could log in remotely to the network from

10  home, correct?

11  A. You could, yes.

12  Q. So if you had a laptop and an internet

13  connection, you could do the same computer

14  work remotely that you could do from the

15  office?

16  A. Computer work, yes.

17  Q. And if you had a printer/scanner at home, you

18  could do the printing and scanning, correct?

19  A. Provided you have all the invoices.  You have

20  to -- so at the time when Marlene was here,

21  the percentage of invoices that came via hard

22  copy was much higher.  Today, after that

23  pandemic, you know, not just us but many

1     companies that were doing mail invoices are

2     now doing -- have migrated to electronic.  I

3     guess if there is any good thing from the

4     pandemic, that's probably one thing that has

5     helped.

6   Q.  Now if you look at the sentence before that

7     where it says Mary was talking about wanting

8     to try to work with employees faced with

9     hurdles to deal with and you responded that

10    you shared the sentiment but that you

11    explained that the job couldn't be done

12    remotely or you didn't think it could be done

13    remotely as well at that point in time.  Is it

14    fair to say that Mary was saying or advocating

15    for Marlene to be able to do the job remotely?

16  A.  I would not say she was advocating.  I think

17    she was just raising the question.

18  Q.  And you were answering the question by saying

19    you didn't think it would work?

20  A.  That's correct.

21  Q.  Now earlier you had testified about kind of

22    the pluses and minuses of New York versus

23    North Carolina.  Were you referring to the

1     this email May 22 which we've marked as

2     Plaintiff's Exhibit 29, did you understand

3     that no final decision had been made about

4     whether or not to move the position from New

5     York to North Carolina?

6  A.  I had no involvement in it so I can't say for

7     sure one way or the other, but it was -- I had

8     not been told at that point that they had

9     already made the decision to move it to North

10    Carolina.

11  Q.  Well, not only had you not been told that they

12    had made a decision, you had not been told

13    whether or not a decision had been made?

14  A.  That's correct.

15  Q.  So as of May 22, you did not know whether the

16    position was going to be in New York or North

17    Carolina?

18  A.  That's correct.

19  Q.  And you did not have any knowledge of any

20    decision being made as of that point in time

21    about that question?

22  A.  That's correct.

23  Q.  Okay.  I am going to go back to what we marked

1    STATE OF NEW YORK)

2    COUNTY OF ERIE   )

3

4        I, Carrie A. Fisher, Notary Public, in and
5    for the County of Erie, State of New York, do
     hereby certify:
6

7        That the witness whose testimony appears
     hereinbefore was, before the commencement of
8    their testimony, duly sworn to testify the
     truth, the whole truth and nothing but the
9    truth; that said testimony was taken remotely
     pursuant to notice at the time and place as
10   herein set forth; that said testimony was
     taken down by me and thereafter transcribed
11   into typewriting, and I hereby certify the
     foregoing testimony is a full, true and
12   correct transcription of my shorthand notes so
     taken.
13

14       I further certify that I am neither counsel
     for nor related to any party to said action,
15   nor in anyway interested in the outcome
     thereof.
16

17       IN WITNESS WHEREOF, I have hereunto
     subscribed my name and affixed my seal this
18   18th day of July, 2022.

19

20   _____
21   Carrie A. Fisher
     Notary Public - State of New York
22   No. 01FI6240227
     Qualified in Erie County
23   My commission expires 5/02/23

# EXHIBIT 8

# Extended Leave of Absence Request



**Company Instructions:** A company representative with the appropriate authority must submit all requested information to TriNet via the Extended Leave Request Action through the TriNet online platform. Leave requests should be submitted to TriNet as soon as requested by the employee. If advance notice is received, requests should be submitted no less than seven business days prior to the leave effective date.

## Company Representative

| LEGAL NAME (as shown on employee's Social Security Card) | | | TRINET EMPLOYEE ID IF KNOWN |
|---|---|---|---|
| Last Johnson | First Holly | Middle H | 00001335015 |
| COMPANY NAME Akoustis Technologies | | | |

TriNet will modify the employee's status in accordance with your directions. Please note the following:

**Notifications:**

The employee will receive a Leave of Absence Notification letter explaining the leave conditions and rights as they pertain to the leave.
Any state or federal notices of employee's rights under a state or federal leave plan will be sent to the employee's home address. Examples: Family Medical Leave Act (FMLA), Pregnancy Disability Leave (PDL), California Family Rights Act (CFRA).

**Benefits:**

In accordance with the TriNet Benefits Guidebook, if granted an Extended Leave of Absence which is not governed by a state or federal leave plan (such as FMLA or California PDL), the employee's benefits coverage will continue as if the employee was an active employee for 30 days. After those 30 days, coverage will continue until the end of the month in which the 30th day occurs.
If the employee is eligible for and takes leave under a state or federal leave law with benefits protection, benefits will end at the end of the month following the exhaustion of the available leave. COBRA continuation will then be offered to the employee, if eligible.

**Disability Claims:**

Employees eligible for TriNet sponsored group short- and/or long-term disability benefits with Aetna must initiate their own claim by contacting Aetna directly. Eligible employees will be sent an Initial Notice that contains Aetna's contact information. State disability claim forms (when applicable) will be sent to the employee with their initial notification letter. These state disability claim forms must be completed and filed by the employee and sent directly to the applicable state agency.

**Payroll Time Entry:**

- If the employee will be using any PTO or sick or vacation time, the leave must be noted as a paid leave and the time should be reported on the Payroll Time Entry page along with the regular on-cycle payroll. If the leave is not fully paid, Leave Without Pay hours should be entered to reach the expected standard pay period hours.
- Special Payroll entries for an employee designated as on an unpaid leave should be sent to the TriNet Client Services Associate (examples: bonus, commissions, payment of accrued time, holiday pay). Time entry via the TriNet online platform will no longer be accessible for employees on unpaid leave until they return to work.

**Return to Work:**

Please submit a Return to Work action request via the TriNet online platform as soon as the employee returns to work. A medical release (if medical leave) should be collected from the employee upon return to work. If an employee fails to return to work or requests additional leave and/or accommodations, please contact your TriNet Human Capital Consultant for guidance.

## Leave and Benefit Premium Repayment Approval

**Extended Leave of Absence:**
☒ Approved ☐ Denied

**Benefit Premium Repayment:**
☐ Approved
☒ Denied    Employee is responsible to submit payments on a bi-weekly basis
☐ We have made alternate arrangements with the employee
☐ Not Applicable - the employee is not enrolled in group benefits

## Leave of Absence Condition

**Please confirm:**
☒ First day of leave: 6/3/19    ☒ First day/leave is unpaid: 6/3/19
☒ Employee's last day worked: 5/31/19    ☒ Date of disability (if medical or worker's compensation): 6/3/19

Will the employee be using PTO or sick or vacation time while on LOA? (Hours will be applied at the beginning of the leave unless otherwise indicated in the notes section of the TriNet Extended Leave Request Action submission.)
☒ None
☐ Sick. Indicate how many hours will be applied —————
☐ Vacation. Indicate how many hours will be applied —————
☐ PTO. Indicate how many hours will be applied —————
☐ Other Type of Pay (other than regular, sick, PTO or vacation, such as admin pay or floating holidays) Type: ————— Hours: —————

Does this leave qualify for FMLA or other state family medical leave? (Talk with your Human Capital Consultant if you need help determining)
☐ Yes  ☒ No

**Please Note:** The Company is responsible for timely reporting of job status and payroll changes to TriNet.

## Company Representative Signature

| PRINTED NAME AND TITLE | SIGNATURE | DATE |
|---|---|---|
| Holly H. Johnson  Dir of HR | Holly H Johnson | 6/13/19 |

**Akoustis-Kruly 000426**

# EXHIBIT 9

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF NEW YORK

3    ------------------------------------------------

4    **MARLENE A. KRULY,**

5                    Plaintiff,

6     -vs-                      Index No. 21-CV-6181G

7    **AKOUSTIS TECHNOLOGIES, INC.,**

8                    Defendant.
     ------------------------------------------------

9

10        **EXAMINATION BEFORE TRIAL OF LORA SHEALY**

11                **APPEARING REMOTELY FROM**

12               **CORNELIUS, NORTH CAROLINA**

13

14

15                    June 23, 2022

16                1:29 p.m. - 6:33 p.m.

17                 pursuant to notice

18

19

20    REPORTED BY:

21    Carrie A. Fisher, Notary Public

22    APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

23

1    get paid.  It's a -- you know, it's not a job

2    that you could just say we'll let it go for

3    six months because then we would probably get

4    sued because we wouldn't pay any of our bills,

5    so we had to have someone write the checks and

6    pay the bills and so we had to hire somebody

7    to do that job.

8  Q.  Let's talk about that, and then we will come

9    back to this other topic.  What role, if any,

10   did you play in finding somebody to do that

11   job while Marlene was out?

12 A.  Well, finding somebody to do the job?  Well,

13   that was my job.  So if I got a job req, then

14   it was my job to go find somebody to fill the

15   job who is qualified for the job.

16 Q.  Do you recall any discussion about whether

17   that -- somebody to fill the job would be in

18   New York or North Carolina?

19 A.  You know, I've tried to remember some of these

20   details, but it's very vague to me other than

21   what I've written in my notes.  That's really

22   the best of what I know.

23 Q.  Whose decision was that in terms of whether

1      the job would be in New York or North

2      Carolina?

3  A.  That would decision would have been made by

4      people higher up than me.  That would have

5      been like the CFO because that was his

6      department.

7  Q.  So that would have been Ken?

8  A.  What's that?

9  Q.  Would that be Ken?

10 A.  Ken -- I mean, Ken was the person in charge of

11     the department and so he is the decision maker

12     for his department.  And by this time we had

13     hired Holly, and she was the director of HR so

14     she would have been above me so those

15     decisions would have been made without me.

16 Q.  So you weren't a part of the discussion about

17     whether it be New York or North Carolina?

18 A.  I remember those discussions, I do.  I don't

19     remember what was said.  I just know that

20     ultimately I was not the final decision maker.

21     So like they might have asked my opinion or

22     something which I don't -- I don't remember

23     that happening, but we're very collaborative

1    Q. Well, because you don't necessarily know who

2       is doing it today.

3    A. No, I have no idea.  I don't know anything

4       about what's going on.

5    Q. Do you know who was doing it when you left?

6    A. When I left it would have been I believe

7       Kristen, Kristen Gaines.

8    Q. And was Kristen the person who was initially

9       hired as a temp?

10    A. Yes, definitely.

11    Q. So from the time -- well, let's back up.

12         So before Marlene was doing it, who was

13       doing accounts payable?

14    A. Oh golly, man, you're talking about a long

15       time ago.  You know what, here is the thing

16       about memories is that things stand out and

17       then there might be a gap, you know, so I very

18       vividly remember when we first started the

19       company within the first few years -- oh,

20       well, when we hired our first CFO she took

21       over accounts payable, Cindy.  So that was in

22       North Carolina because I remember my person

23       who I shared an office with her name was

1       she was ready to come back to work and the

2       company said you don't have a job to come back

3       to?  In words or substance, is that how the

4       conversation went?

5    A. I don't know if it went in that order, you

6       know.

7    Q. Okay.  What's your recollection?

8    A. You know, I'm not sure.  I really don't know

9       the dates and the timeline and the order but I

10      do know that we were told that we needed --

11      that it was a best practice to let her know

12      that due to FMLA and since New York had less

13      than 50 employees that there was not -- that

14      we were not required to hold the job and that

15      we needed to communicate that to her.  I don't

16      know where that was in the timeline though.  I

17      really don't.

18    Q. So that communication would have been made

19      during her leave of absence and before she was

20      ready to return to work?

21    A. During her -- well, I don't know if it would

22      have been during her leave or when she

23      notified us that she was like going on leave

1    status is.  She's not keeping me in the loop.

2    I need to reach out to her."  Nothing like

3    that ever happened?

4  A. Not that I ever wondered, like proactively

5    wondered.  I think that Marlene had implied to

6    me and I don't know to Dave, but she had kind

7    of implied to me that she had no idea when she

8    would be returning to work so it was a

9    question.  It was a question mark, like when

10    could she come back.  We don't really know.

11  Q. All right.  Let's mark as Exhibit 34 the pages

12    Bates numbered 487 and 488.  See that there?

13  A. Yep.

14  Q. The email is at the top of the page, but the

15    date of it is August 19 of 2019 from Marlene

16    to you.

17  A. Yep, uh-huh.

18  Q. Do you recall getting this email?

19  A. I don't.  I mean, I remember because you just

20    showed it to me.  Yeah, I mean, I definitely

21    remember she was -- because your heart hurts

22    for somebody when they're going through this.

23  Q. Do you recall that at one point in time that

1    going to be on there.  I don't remember.  I

2    just know that it was more of an HR call

3    rather than being the VP of the fab, you know.

4    I mean, she is trying to deliver products and

5    make money and, you know, this was more of an

6    HR phone call.

7  Q. Now in the email here she said she wanted to

8    have a conversation in regards to her

9    anticipated return to work.

10 A. Mhmm.

11 Q. So as of November 8th, 2019, Marlene still

12    thought she had a job to come back to, right?

13 A. I can't venture to guess what Marlene thought

14    or didn't thought.  I mean, I don't know who

15    she talked to or I don't know what was in her

16    mind.  I don't.

17 Q. Prior to November 8th of 2019, you had not

18    told Marlene that she did not have a job to

19    come back to, correct?

20 A. There is something documented where I did tell

21    her that.  My recollection is it was after she

22    reached out.  She said I want to have this

23    conversation, and then she and I sat and I

1     took notes of the conversation.  And then I

2     think after that, that was when I told her

3     that there was no job.

4  Q. Right.  So that would have been after November

5     8th of 2019, correct?

6  A. Yeah, that's correct.

7  Q. So prior to November 8th, you had not told her

8     that there was no job to come back to,

9     correct?

10  A. Prior to that, we had told her she wasn't

11     guaranteed to have a job to come back to but

12     up until then that had not been officially

13     communicated to her.

14  Q. Okay.  And she suggested having the call

15     sometime later in November.  In fact, did you

16     talk to her the week of November 18th?

17  A. I don't remember the date.

18  Q. Okay.  How many conversations did you have

19     with her after November 8th?

20  A. I don't know.  I don't know.  I have no idea.

21  Q. What do you recall about any of -- any

22     conversations you had with Marlene in November

23     of 2019?

```
 1      STATE OF NEW YORK)

 2      COUNTY OF ERIE    )

 3


 4          I, Carrie A. Fisher, Notary Public, in and
 5      for the County of Erie, State of New York, do
        hereby certify:
 6

 7          That the witness whose testimony appears
        hereinbefore was, before the commencement of
 8      their testimony, duly sworn to testify the
        truth, the whole truth and nothing but the
 9      truth; that said testimony was taken remotely
        pursuant to notice at the time and place as
10      herein set forth; that said testimony was
        taken down by me and thereafter transcribed
11      into typewriting, and I hereby certify the
        foregoing testimony is a full, true and
12      correct transcription of my shorthand notes so
        taken.
13

14          I further certify that I am neither counsel
        for nor related to any party to said action,
15      nor in anyway interested in the outcome
        thereof.
16

17          IN WITNESS WHEREOF, I have hereunto
        subscribed my name and affixed my seal this
18      15th day of July, 2022.

19

20      _____
                Carrie A. Fisher
21              Notary Public - State of New York
22              No. 01FI6240227
                Qualified in Erie County
23              My commission expires 5/02/23
```

# EXHIBIT 10



June 13, 2019

Dear Marlene,

In an effort to help you through this process as seamlessly as possible, I wanted to follow up with some additional information:

1. Extended Leave of Absence (or LOA) Request – we have approved and submitted this through TriNet.  You will receive some detailed information from the TriNet LOA department.  This will cover benefits info and return to work instructions.

2. NY has a Short-Term Disability Plan for most NY State Employees. Your paperwork to begin the process of what benefits you're eligible for has been entered into the TriNet system. TriNet is currently in the process of filling out the "Employer" portion of the paperwork. When this is complete, TriNet will email you the forms (likely sometime next week) and you will need to fill out the "Employee" Section of the forms and send to NY State for processing. There will be instructions on how and where to send the form(s) in the email communication from TriNet. If you have any questions at any time regarding the process of being out on leave, filling out paperwork or your disability benefits you should feel free to contact the TriNet Employee Solutions Center Monday – Friday 4:30am – 9pm EST (800) 638-0461 or employees@trinet.com

3. In regard to your return to work date, although your LOA request is approved, we may need to fill your position while you are out and so there is no guarantee that a position will be available upon your return. Please be sure to touch base with me every month to let me know how you're doing and as we get closer to the date when you're able to return to work we will have more information about your current position availability or other open positions.


Please let me know if any questions you have, or how we can help you further.  We wish you the very best and hope everything goes well.

Kind regards,


Holly Johnson
Director of Human Resources

*Akoustis-Kruly 000425*

# EXHIBIT 11

| **From:** | Marlene Kruly <mkruly@frontiernet.net> |
| **Sent time:** | 06/26/2019 03:37:24 PM |
| **To:** | Mary Winters <mwinters@akoustis.com> |
| **Subject:** | Kruly |

[External]

Hi Mary

I know you're on vacation, and once again I apologize for my timing of this email.

I found out some other disturbing news today having to do with my medical insurance.  Actually this would apply to all employees who work at Akoustis and who might have the misfortune of being ill.
Trinet will officially stop my medical benefits by August 1st, if I have not returned to work by that date.  If I cannot return to work by August 1st, I then have to apply for COBRA to the tune of $ 830/month.  This does not include vision or dental health coverage- those coverages will lapse at this time.  I won't even be done with my treatments by August 1st.

This whole process is a financial hardship as it is,  I also have to pay back my portion of medical insurance upon my return for the months of June and July.

I thought it would be worth mentioning this because like I said previously this would be the same scenario for anyone who might happen to fall ill beyond their control, and who doesn't have additional coverage such as AFLAC or something like that. I'm not sure how this can be Trinet's SOP since disability runs for at least 6 months.


Not good news!

Marlene

# EXHIBIT 12

| **From:** | Lora Shealy <lshealy@akoustis.com> |
| **Sent time:** | 11/26/2019 03:30:25 PM |
| **To:** | Marlene Kruly <mkruly@akoustis.com> |
| **Subject:** | Waive "Benefit Draw" while on leave |

Dear Marlene,

It was a pleasure speaking with you today! I wanted to send you an email to document what we discussed regarding the Benefit draw from Trinet while you were on leave. Akoustis is going to waive the repayment of the following benefits which were paid on your behalf:

8/2 $96.68

7/19 $96.64

7/5 $193.04

Grand Total $386.36

Many Thanks,

Lora Shealy
Human Resources Manager
Akoustis Technologies, Inc.
9805-A Northcross Center Court | Huntersville, NC
P +1 704.274.3591
lshealy@akoustis.com | www.akoustis.com



The contents of this e-mail message and any attachments are the property of Akoustis Technologies, Inc. and its subsidiaries, and are intended solely for the addressee(s) listed. The information may be confidential or legally privileged. This transmission is sent in trust for the sole purpose of delivery to the intended recipient(s). If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

# EXHIBIT 13

Yes I think that's perfect.

**Holly Johnson**

Director of Human Resources

Akoustis Technologies, Inc.

9805-A Northcross Center Court | Huntersville, NC 28078

P: 704-274-3594

hjohnson@akoustis.com | www.akoustis.com



The contents of this e-mail message and any attachments are the property of Akoustis Technologies, Inc. and its subsidiaries, and are intended solely for the addressee(s) listed. The information may be confidential or legally privileged. This transmission is sent in trust for the sole purpose of delivery to the intended recipient(s). If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

**From:** Lora Shealy <lshealy@akoustis.com>
**Sent:** Monday, August 19, 2019 1:24 PM
**To:** Holly Johnson <hjohnson@akoustis.com>
**Subject:** Fwd: Update
Here was her response below- what do you think if I say something like this to Ken and Dave P (should I also copy Mary? I know that sounds odd but she'd been in with some of those discussions regarding Marlene's absence and this would keep her updated too) =
Update on Marlene Kruly - Marlene has notified me that she is still undergoing treatment and also that she is having some unexpected delays in her original treatment plan/schedule. I asked her if she could provide an estimated return-to-work date and she said "I wouldn't even dare to guess at this." I will continue to keep you posted of any updates as they become available.
Lora Shealy
Human Resources Manager
Akoustis Technologies, Inc.
9805-A Northcross Center Court | Huntersville, NC
P +1 704.274.3591
lshealy@akoustis.com | www.akoustis.com



The contents of this e-mail message and any attachments are the property of Akoustis Technologies, Inc. and its subsidiaries, and are intended solely for the addressee(s) listed. The information may be confidential or legally privileged. This transmission is sent in trust for the sole purpose of delivery to the intended recipient(s). If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

Begin forwarded message:
**From:** "Marlene Kruly" <mkruly@frontiernet.net>
**Subject: RE: Update**
**Date:** August 19, 2019 at 12:16:12 PM EDT

*Akoustis-Kruly 000489*

**To:** "'Lora Shealy'" <lshealy@akoustis.com>

[External]
Lora,
I wouldn't even dare to take a guess at this.

**From:** Lora Shealy [mailto:lshealy@akoustis.com]
**Sent:** Monday, August 19, 2019 12:13 PM
**To:** Marlene Kruly
**Subject:** Re: Update

Hi Marlene,

Based on this new info, if you had to make an estimate of the date that you might return, when would that date be?

Lora Shealy
Human Resources Manager
Akoustis Technologies, Inc.
9805-A Northcross Center Court | Huntersville, NC
P +1 704.274.3591
lshealy@akoustis.com | www.akoustis.com



The contents of this e-mail message and any attachments are the property of Akoustis Technologies, Inc. and its subsidiaries, and are intended solely for the addressee(s) listed. The information may be confidential or legally privileged. This transmission is sent in trust for the sole purpose of delivery to the intended recipient(s). If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

On Aug 19, 2019, at 10:49 AM, Marlene Kruly <mkruly@frontiernet.net> wrote:

[External]
Hi Lora,

Just thought I would send a quick note to update you on the changes with my treatment.

I was supposed to have my 4th and final round of chemo this week, but my bloodwork is off. My white count is low, and they want to give it a chance to rebound before starting next round. They have also given me a couple of days off with radiation as well. Hopefully bloodwork will rebound and we can get this done. Haven't felt good all weekend.

So just wanted you to be updated on timing of things.

Thanks,
Marlene

# EXHIBIT 14

**M. Kruly Data Points**

**2018**

There were issues in 2018 with Marlene's complaining regarding Dave, but also her own attendance issues as well as an issue where she did not properly document time worked and said she had not been paid correctly. She indicated she had entered time other than what she actually worked.

**2019**

**Feb 12** – <u>Dave</u> reached out with concerns about Marlene' performance and attendance. Lora provided history of issues from 2018.

**Feb 14** – talked to <u>Dave</u> regarding concerns with Marlene. Centered about skillset, lack of initiative and attendance

**Feb 15** – <u>Marlene</u> reached out to Ken regarding her concerns regarding Dave. Indicated that "she laid into him…" that day as well.

**Feb 19** – Talked to <u>Marlene</u> about concerns with Dave. Feels he is condescending. Following this, I talked with Jen. Her feedback was that Dave is a hoverer, can be defensive. Marlene has been talking to Jen about her concerns and Jen supported what she had to say. Believes Marlene is capable. Did say that she is rough and gruff. I spoke with Dave and Marlene as well. I later spoke with Kelly who said that Marlene talks poorly to Dave. Did not support all of the things Marlene and Jen said. They both asked Kelly to talk to me about this, but she did not feel it was appropriate and felt that the two had been colluding.

**Feb 22** – <u>Marlene</u> sent me an email notifying me that Dave constantly interrupts her, stands in her space, and corrects and directs her. Feels it is over the top and said Kelly even witnessed it. He encroaches her personal space. Believed it to be "bullying and intimidating".

**Feb 27** – Jenn agreed both sides have valid concerns. Agreed Dave not a bully but does think he can be difficult and not very nice.

**Mar 4** – Marlene wanted to talk prior to our in person meeting the next day. Believes he has control issues. Talks to her like a child.

**Mar 5 – Performance Discussion, Marlene, Dave and Holly present**

Dave's Performance discussion:

- Concerns addressed:
- Invoice processing and payment – struggles to complete tasks that are not exactly the same as the regular processes.
- Excel skills – struggles to use formulas and other features critical to the reconciliation, audit and debit card processes.
- Behavior – questions authority, difficulty accepting direction from her manager, disrespectful to manager

- Independent problem identifying and solving

Created a development plan: Training plan is 4 hours per week and runs through the end of April

- Improve knowledge of excel
- Improve knowledge of Sage
- Maintain a 95% attendance rate
- Maintain professional interactions with manager and co-workers

Marlene's concerns:

1. The way Dave communicates and treats her
2. Dave's management style – micro-manages, in her space, interrupts
3. Dave does her work when she is out

**Mar 11** – Marlene sent me an email seeking to clarify the outcome of the meeting, as she didn't feel her concerns of Dave's micro-management were addressed.

**Mar 12** – Dave sent training email to Marlene to ensure very clear.  Created a training space for her and set aside 4 hours per week for her.  He will do any of her work that she is unable to complete due to training time.  She was to provide a two-week status summary to Dave on March 22, April 5, April 19 and May 3.

**Apr 30** – Dave sent me a document "MKruly Items to note" which lists ongoing mistakes and concerns. Discussed these issues.  Dave did not determine whether the errors are considered a lot.  Supposed to see improvement by May.  Want to see her translate training to results. Behavior and attitude have not improved.  Will be absent today and next few days because mentally unable to work due to medical tests.

**May 13** – Meeting with Ken and Dave regarding Marlene.  Low performer and a drain on other resources.  Ken would like to move A/P back to Corporate as it's usually a part of a shared services organization.  Unexpected absences continue, no marked improvement in skills.  Ken plans to talk with Mary (I will draft data points and send to Dave to review).

**May 20** – Data points sent to Dave to review.

**May 21** – Dave responded.  He talked with Mary about the concerns about performance and moving the role to NC.  He and Mary agreed that making a switch of this nature would be a large negative impact on morale in NY because it would be directly linked to removing a person due to a medical problem, not because it makes sense to move the activity or because of performance.  Agreed to let things play out a bit and see what happens with medical side of things.

**May 22** – Dave sent Ken and email regarding his conversation with Mary.  He indicated that Mary "is not aware of the performance issues", but reiterated what he indicated in his note to me.

**May 30** – Dave sent me details regarding what is going on with Marlene, including attendance, and expressed concerns with inconsistent attendance and how it affects his ability to get the work done.

**May 31** – last day Marlene worked.

**Jun 17** – Dave indicated that Marlene's training plan was not completed due to attendance.

**Marlene's attendance:**

2018 – missed 22 days

2019 – missed 19.5 days, late 6 days

- Jan 14
- Feb 7 – 11
- Apr 15
- Apr 23 – late
- Apr 24
- Apr 25 – late
- Apr 26 – late
- 4/30 – 5/3 (all days except 5/2 were unexpected)
- 5/7 – 5/10 (only 5/7 was planned)
- 5/20 – out half day (unplanned)
- 5/22 – out half day (knew in advance)
- 5/23 – out half day (knew in advance)
- 5/24 (unplanned)
- 5/28 (unplanned, used PTO)
- 5/29 – late
- 5/30 – late
- 5/31 – late

**Jun 12** – Marlene submitted a requested for Extended Leave of Absence. M. Burgess said to include language regarding no guarantee of employment as may need to fill the position. This is important to protect the company. Holly, Dave and Lora met to discuss this and what Dave wants to do. Dave indicated that he would prefer to not hire a temp and train that person and that person leave. He needs help as Marlene has already been out a lot. We all discussed and agreed to the approach in putting together information not help Marlene with LOA and also communicate per Burgess' guidance.

Marlene declined a phone conversation and requested an email. Lora and I put together an email with the information we wanted to share with her and sent it over.

# EXHIBIT 15

| From: | Dave Pettitt |
| --- | --- |
| Sent time: | 05/22/2019 03:18:12 PM |
| To: | Kenneth Boller |
| Cc: | Holly Johnson |
| Subject: | Accounts Payable |

Hi Ken,

I had a conversation with Mary after she returned from the Board Meeting as it relates to the Accounts Payable position. Naturally she is not aware of the performance issues as it relates to the position, but was aware of Marlene's recent medical situation. Mary's discussion with you was more around the fact that Akoustis should be able to work with employees faced with hurdles to deal with. I think we all share in that sentiment, though I also explained the ability to work remotely is not something that is conducive for a role in Accounts Payable, given the amount of printing, scanning, and direct contact needed for the position to be successful.

You have mentioned the idea of moving AP to North Carolina. I thought about whether AP would be more or less efficient in North Carolina vs New York.
- Advantages of staying in NY
  - More Volume - Current invoice volume is about 60% NY / 40% NC
  - Purchasing is in NY – does allow some more efficient conversations on things like vendor issues
- Advantage of moving to NC
  - NC is more the Corporate location
  - The check run process is handled in NC
  - While NY has more invoices, North Carolina has the higher percentage of invoices that require more time to process – invoices not on production purchase orders

In the end, I think the position itself is about the same level of efficiency working from either location.

Unfortunately, Marlene's medical condition has creates a real issue in making any decision, whether it be to find a better candidate and keep in NY or move to NC. Mary and I both feel that any sort of move at this time would create a ton of negative morale in NY. If you want to move forward, we should include Mary in any future discussions.

Thanks
Dave

Dave Pettitt
Plant Financial Controller

AKOUSTIS
SMART SELECTIVITY SOLUTIONS

5450 Campus Drive | Canandaigua, NY | dpettitt@akoustis.com
Phone: 1-585-919-3034 | Cell: 1-585-430-8929

# EXHIBIT 16


# Job Requisition Form

Today's Date: 7/12/19

Position Title: ~~Staff Accountant~~ *AP Specialist*

Location: ☒ North Carolina ☐ New York ☐ Other:

Department: Finance

Hiring Manager: Andrew DiFilippantonio

**Job Status** (Please check as applicable)

☐ Full-Time ☐ Part-time

☐ Salaried ☐ Hourly

☒ Temporary, projected length: *2 - 3 mths*

Preferred Start Date: 7/22/19

**Reason for Recruitment:**

☒ **Replacement Position-** Name of person being ~~replaced~~ *on LOA*: **Marlene Kruly**

☐ **NEW position-** in the budget? ☐ Yes (month budgeted): _____ ☐ No

| | Annual Operating Plan (AOP) | Requisitioned (if different) |
|---|---|---|
| Salary | | *$20 - $30/hr.* |
| Bonus % | | *—* |
| RSUs | | *—* |
| Options | | *—* |
| Relocation | | *—* |
| Recruiting fee | | *— (Pref not)* |
| Start Date | | |

**Job Summary:**

*Processing AP, audit/process credit card bills, reconcile vendor statements, process 1099s, maintain files.*

**Business Case:**

*This position is needed for the day to day processing of payables.*



# Job Requisition Form

**SIGNATURE APPROVALS:**

**Date:**

| | | |
|---|---|---|
| *Controller/Plant Controller:* | NA | |
| *Department Lead:* | NA | |
| *HR Director:* | Holly H M | 7/15/19 |
| *CFO:* | | 7/12/19 |
| *CEO:* | John B. Sc | 7/15/19 |

*Akoustis-Kruly 000310*

# EXHIBIT 17

9/5



*Akoustis-Kruly 000714*

IP ✓ - Lora? Kristen doing very well → A/P has officially moved. Andrew wants to hire. Has trained her. Since temp, could leave for a FT job.
- Lora will talk w/ Marc? rec for how to & whether to commun. w/ Marlene.
- We'll talk w/ Ken

• Kristen?
  - Andrew talk to her (may not be looking)
  - prep what we want; consider talking to Drew, then Mary. Lay it out, along w/ proposed messaging to Marlene.

11/8

- Lora) Marlene sent em. to her + Mary. Wants a priv. 3-way call w/ them re. her return date.
- L talked to Mary, agreed L would talk to her. Mary is busy + also wasn't her mgr. L told Mary the job moved + isn't moving back. M said understood business needs, was just concerned w/ optics.

*Akoustis-Kruly 000716*

# EXHIBIT 18

**From:** Lora Shealy <lshealy@akoustis.com>
**Sent:** Tuesday, September 10, 2019 2:04 PM
**To:** Kenneth Boller
**Cc:** Holly Johnson
**Subject:** Update on A/P position

Hi Ken,

I spoke to <span style="color:red">A/C PRIVILEGE</span>

If you and Holly agree (as I anticipate that you will that have been no incidents as mentioned in his email), we can proceed with hiring Kristen if that is the direction that you feel that is best for your department. If that is the case, please let me know and we can get the ball rolling.

Many Thanks,

Lora Shealy
Human Resources Manager
Akoustis Technologies, Inc.
9805-A Northcross Center Court | Huntersville, NC
P +1 704.274.3591
lshealy@akoustis.com | www.akoustis.com



The contents of this e-mail message and any attachments are the property of Akoustis Technologies, Inc. and its subsidiaries, and are intended solely for the addressee(s) listed. The information may be confidential or legally privileged. This transmission is sent in trust for the sole purpose of delivery to the intended recipient(s). If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

*Akoustis-Kruly 000706*

# EXHIBIT 19

Hi Andrew, Here's the Job Req form.
Lora

 This link will work for anyone in akoustis.com.

 Job Requisition Form_Blank

Open



Microsoft respects your privacy. To learn more, please read our <u>Privacy Statement.</u>
Microsoft Corporation, One Microsoft Way, Redmond, WA 98052

*Akoustis-Kruly 000707*

**From:** Lora Shealy <lshealy@akoustis.com>
**Sent:** Thursday, September 12, 2019 5:26 PM
**To:** Andrew DiFilippantonio
**Subject:** Kristen

Hi Andrew,
I sent you a link in Sharepoint with a blank Job Req form. Can you please fill out for Kristen? Ken has given us the green light to hire her as a regular employee and we need to fill out this form and get all of the signatures and then we can get her an offer letter!
Thanks,
Lora


Lora Shealy
Human Resources Manager
Akoustis Technologies, Inc.
9805-A Northcross Center Court | Huntersville, NC
P +1 704.274.3591
lshealy@akoustis.com | www.akoustis.com



The contents of this e-mail message and any attachments are the property of Akoustis Technologies, Inc. and its subsidiaries, and are intended solely for the addressee(s) listed. The information may be confidential or legally privileged. This transmission is sent in trust for the sole purpose of delivery to the intended recipient(s). If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

*Akoustis-Kruly 000708*

| From: | Andrew DiFilippantonio <IMCEAEX-_O=EXCHANGELABS_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=10B8872A7A514D4F8CB859A0371884FD-ADIFILIPP@namprd19.prod.outlook.com> |
|---|---|
| Sent: | Friday, September 13, 2019 8:44 AM |
| To: | Lora Shealy |
| Subject: | RE: Kristen |

Good Morning Lora,
I'll get this filled out and over to you this morning.

Andrew

**From:** Lora Shealy <lshealy@akoustis.com>
**Sent:** Thursday, September 12, 2019 5:26 PM
**To:** Andrew DiFilippantonio <adifilipp@akoustis.com>
**Subject:** Kristen

Hi Andrew,
I sent you a link in Sharepoint with a blank Job Req form. Can you please fill out for Kristen? Ken has given us the green light to hire her as a regular employee and we need to fill out this form and get all of the signatures and then we can get her an offer letter!
Thanks,
Lora

Lora Shealy
Human Resources Manager
Akoustis Technologies, Inc.
9805-A Northcross Center Court | Huntersville, NC
P +1 704.274.3591
lshealy@akoustis.com | www.akoustis.com



The contents of this e-mail message and any attachments are the property of Akoustis Technologies, Inc. and its subsidiaries, and are intended solely for the addressee(s) listed. The information may be confidential or legally privileged. This transmission is sent in trust for the sole purpose of delivery to the intended recipient(s). If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

*Akoustis-Kruly 000709*

*Akoustis-Kruly 000710*

**From:** Lora Shealy <lshealy@akoustis.com>
**Sent:** Friday, September 13, 2019 10:10 AM
**To:** Andrew DiFilippantonio
**Subject:** Re: Job Rec

I feel good with ⬛...or $ ⬛ per hour. What about you? Her bonus is ⬛ %.

> **Lora Shealy**
> Human Resources Manager
> Akoustis Technologies, Inc.
> Office: (704) 997-5735 x104
> Cell: (704) 763-0111
> Email: lshealy@akoustis.com

On Sep 13, 2019, at 10:03 AM, Andrew DiFilippantonio <adifilipp@akoustis.com> wrote:

> On her application she put $ ⬛ . She's at $4⬛ . We discussed bumping her to $ ⬛ or $ ⬛ an
> hour which is ⬛ and ⬛ . One other thing, I forgot to ask about bonus. Would she be at ⬛ %?
>
> **From:** Lora Shealy <lshealy@akoustis.com>
> **Sent:** Friday, September 13, 2019 10:01 AM
> **To:** Andrew DiFilippantonio <adifilipp@akoustis.com>
> **Subject:** Re: Job Rec
>
> I thought we were going to give her the higher amount that she originally asked for?
>
> > **Lora Shealy**
> > Human Resources Manager
> > Akoustis Technologies, Inc.
> > Office: (704) 997-5735 x104
> > Cell: (704) 763-0111
> > Email: lshealy@akoustis.com
>
> On Sep 13, 2019, at 9:58 AM, Andrew DiFilippantonio <adifilipp@akoustis.com> wrote:
>
> > That works for me. Lastly, do we want to leave her at $ ⬛ /hour or give her a bump
> > when she comes on permanent?
> >
> > **From:** Lora Shealy <lshealy@akoustis.com>
> > **Sent:** Friday, September 13, 2019 9:56 AM
> > **To:** Andrew DiFilippantonio <adifilipp@akoustis.com>
> > **Subject:** Re: Job Rec
> >
> > How about sept 23 for start date? That gives us time to type offer letter. Does that
> > work for u?
> > Agree...hourly.

1

So let's go with     and     ! If you can get sign off from Ken, Holly and Jeff today that's awesome. Then we will type up offer and get to her first of next week. Thanks!

**Lora Shealy**
Human Resources Manager
Akoustis Technologies, Inc.
Office: (704) 997-5735 x104
Cell: (704) 763-0111
Email: lshealy@akoustis.com

On Sep 13, 2019, at 9:52 AM, Andrew DiFilippantonio <adifilipp@akoustis.com> wrote:

Hey!
I do agree     RSUs and     Options is better.  My only questions were:

1. When do we want her perm start date to be?
2. Hourly or Salaried and Holly said hourly
3. The RSU/Option piece which you just answered.

Thank you,
Andrew

**From:** Lora Shealy <lshealy@akoustis.com>
**Sent:** Friday, September 13, 2019 9:50 AM
**To:** Andrew DiFilippantonio <adifilipp@akoustis.com>
**Subject:** Re: Job Rec

Hey!
I've got a personal appointment from 10-1 but can email freely during that time. Can you put questions in an email? (I will drop in around 130-230 but have to work on equity work for Todd). I asked Holly and we can include for Kristen -     options and     RSUs or we could do     options but I think the first one is better. Do you agree?

**Lora Shealy**
Human Resources Manager
Akoustis Technologies, Inc.
Office: (704) 997-5735 x104
Cell: (704) 763-0111
Email: lshealy@akoustis.com

On Sep 13, 2019, at 9:35 AM, Andrew DiFilippantonio <adifilipp@akoustis.com> wrote:

Hi Lora,
Meghan said you may or may not be coming in today.  If you have a free minute to discuss the job requisition form (and Kristen), I would greatly appreciate it.

2

*CONFIDENTIAL*     **Akoustis-Kruly 000712**

Thanks,

**Andrew DiFilippantonio**
Accounting Manager
Akoustis Technologies, Inc.
9805-A Northcross Center Court | Huntersville, NC 28078
Direct: 980-689-4158
adifilipp@akoustis.com | www.akoustis.com

*CONFIDENTIAL* *Akoustis-Kruly 000713*

# EXHIBIT 20



# Job Requisition Form

Today's Date: 9-13-19

Position Title: AP Specialist

Location: ☒ North Carolina  ☐ New York  ☐ Other:

Department: Finance

Hiring Manager: Andrew DiFilippantonio

**Job Status** (Please check as applicable)

☐ Full-Time  ☐ Part-time

☐ Salaried  ☒ Hourly

☐ Temporary, projected length: _____

Preferred Start Date: _9-23-19_

## Reason for Recruitment:

☒ **Replacement Position-** Name of person being replaced: _AP Specialist - Marlene Kruly_

☐ **NEW position-** in the budget? ☐ **Yes**  (month budgeted): _____ ☐ **No**

| | Annual Operating Plan (AOP) | Requisitioned (if different) |
|---|---|---|
| Salary | $45,884.80 / 22.06/hr | $24/hour |
| Bonus % | 10% | 10% |
| RSUs | | 1000 |
| Options | | 1000 |
| Relocation | N/A | |
| Recruiting fee | N/A | |
| Start Date | | |

## Job Summary:

*Processing and payment of all payables.*

## Business Case:

*Self-explanatory.*



# Job Requisition Form

**SIGNATURE APPROVALS:**

|  | | **Date:** |
|---|---|---|
| *Controller/Plant Controller:* | | |
| *Department Lead:* | | |
| *HR Director:* | *[signature]* | 9/13/19 |
| *CFO:* | *[signature]* | 9/13/19 |
| *CEO:* | *[signature]* | 9/13/19 |

# EXHIBIT 21

| | |
|---|---|
| **From:** | Marlene Kruly <mkruly@frontiernet.net> |
| **Sent time:** | 09/13/2019 02:42:19 PM |
| **To:** | Lora Shealy <lshealy@akoustis.com> |
| **Subject:** | FW: Oncology Letters |
| **Attachments:** | OncologyLetters9-13-19.pdf |

[External]
Lora,

I have attached two letters from my Dr.'s.
One is from the Radiation Oncologist and the other is from the Oncologist.

The one from Oncologist was issued by the NP, if you would prefer that the Dr. sign this himself, let me know and I will have him do it when I meet with him on Monday, 9/16.

Thank you,
Marlene

**From:** Marlene Kruly [mailto:mkruly@frontiernet.net]
**Sent:** Friday, September 13, 2019 2:26 PM
**To:** mkruly@frontiernet.net
**Subject:** Oncology Letters

*Akoustis-Kruly 000497*



September 5, 2019

**RALPH A
BRASACCHIO, MD
Radiation Oncology
at Sands Cancer
Center**
395 West St
Ste 101
Canandaigua, NY 14424
585-396-6180

Patient:        **Marlene A Kruly**
MR Number:  **774017**
Date of Birth:
Date of Visit:  **9/5/2019**

To Whom It May Concern,

Marlene is currently under my care and will not be able to return to work until 12/1/19.

Please feel free to call my office with any concerns or questions.

Thank you,

If you have questions, please do not hesitate to call me.

*Electronically signed by RALPH A BRASACCHIO, MD 9/5/2019 10:18 AM*

*Akoustis-Kruly 000498*

# Letter Details

WILMOT CANCER CENTER

Interlakes Oncology and Hematology



**INTERLAKES ONCOLOGY AT CANANDAIGUA**
**395 West St**
**Canandaigua NY 14424-1789**
**Dept: 585-393-7040**
**Dept Fax: 585-394-4218**

September 10, 2019

| | |
|---|---|
| Patient: | **Marlene A Kruly** |
| Date of Birth: | |
| Date of Visit: | **9/10/2019** |

To Whom It May Concern:

Marlene A Kruly is currently under our care and will not be able to return to work until 12/1/19. Thank you.

If you have any questions or concerns, please don't hesitate to call.

Sincerely,

SUSAN E ZUMBO, NP
*Electronically signed by SUSAN E ZUMBO, NP 9/10/2019 5:20 PM*

CC:
No Recipients

*This letter was initially viewed by Marlene A Kruly at 9/10/2019 5:40 PM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2016(01)

*Akoustis-Kruly 000499*

# EXHIBIT 22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
ROCHESTER DIVISION

MARLENE A. KRULY,

    Plaintiff,

    v.

AKOUSTIS TECHNOLOGIES, INC.,

    Defendant.

Case No. 6:21-cv-06181-FPG-MWP

**DECLARATION OF HOLLY
JOHNSON IN SUPPORT OF
MOTION FOR SUMMARY
JUDGMENT**

1.    My name is Holly Johnson. I am over the age of 18 and I am competent to make the statements in this Declaration. I declare under penalty of perjury that the statements in this Declaration are true and correct to the best of my knowledge.

2.    I make all statements in this Declaration based on my personal knowledge.

3.    I am the Director of Human Resources for Akoustis, Inc.

4.    On September 13, 2019 at 2:42 p.m., Plaintiff Marlene Kruly sent an e-mail to Lora Shealy, Akoustis's Human Resources Manager, that attached a doctor's note setting for an anticipated return to work date of December 1, 2019. (Appendix at Ex. 21, September 13, 2019 E-mail).[1]

5.    At the time the e-mail was received, Akoustis had already hired a permanent replacement to fill Kruly's Accounts Payable position and there was no position for Kruly to return to.

---

[1] The Appendix refers to the Appendix to Defendant Akoustis Technologies, Inc.'s Statement of Material Facts Pursuant to Local Rule 56(a)(1) submitted herewith.

6. Given our understanding that Kruly was undergoing cancer treatment, it was determined that Akoustis would not inform Kruly at that time that she had no position to return to so that she could focus on her recovery.

7. Once Kruly contacted Ms. Shealy a few months later, in November 2019, to discuss plans for her to return to work, we determined it was appropriate to advise Kruly that the position had been filled and there was no position to return to.

8. I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746(2).

_Holly John_

Holly Johnson

Dated: _September 15, 2022_